# FEDERAL COMMUNICATIONS COMMISSION *v.* RCA COMMUNICATIONS, INC.

NO. 567.

Argued April 29–30, 1953.—Decided June 8, 1953.

*Acting Solicitor General Stern* argued the cause for petitioner in No. 567. With him on the brief were *Benedict P. Cottone, J. Roger Wollenberg* and *Asher H. Ende.*

*Ralph M. Carson* argued the cause for petitioner in No. 568. With him on the brief were *John W. Davis, James A. Kennedy, John F. Gibbons, Burton K. Wheeler* and *Francis W. Phillips.*

*John T. Cahill* argued the cause for respondent. With him on the brief were *Lawrence J. McKay* and *Howard R. Hawkins.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The Mackay Radio and Telegraph Co. (Mackay) provides radiotelegraph service between the United States and a number of foreign countries. Over the opposition of RCA Communications, Inc. (RCAC), which provides

similar service by means of a total of 65 circuits including ones to Portugal and The Netherlands, the Federal Communications Commission authorized Mackay, at that time authorized to communicate with 39 overseas points, to open two new circuits, to Portugal and The Netherlands. RCAC claims that duplicate circuits, already authorized for RCAC and Mackay to 11 other points, are not here "in the public interest," in that Mackay has been unable to show any tangible benefit to the public, such as better, cheaper or more comprehensive service, to be derived from the authorization of Mackay's circuits. RCAC also urges, as a second objection to the authorizations, that because of Mackay's corporate affiliation with The Commercial Cable Co. (Commercial), which conducts cable service to these points in competition with another cable carrier, Western Union, as well as with radiotelegraph service, authorization of Mackay would lessen competition between radio and cable service and would weaken the competitive efficiency of Commercial, in violation of § 314 of the Federal Communications Act.

The Commission found that competition, that is, duplication of radiotelegraph facilities, would not impair the ability of the existing radio carrier, RCAC, and cable carriers to render adequate service. More facilities are at present authorized than are necessary to handle the present and expected volume of telegraph traffic under normal operating conditions, but Mackay's proposed service would be adequate and would not require substantial new investment. For such reasons the Commission concluded that competition was "reasonably feasible." In addition, although it did "not appear that Mackay's proposed service to each of the points at issue will result in lower rates or speedier service, or will otherwise be superior to or more comprehensive than the service now available via RCAC," the proposed service would be superior to that now provided by Mackay itself and its affili-

ated cable company, Commercial. Finding that "over-all competition for telegraph traffic generally" would be increased, and more effective radiotelegraph competition introduced, the Commission concluded that duplicate facilities should be authorized because of the "national policy in favor of competition." From this policy, the Commission said, it follows that "competition" is in the public interest where competition is "reasonably feasible." The Commission, with two members dissenting, thereupon authorized Mackay's proposed service to Portugal and The Netherlands. —— F. C. C. ——. RCAC sought review and was successful in the Court of Appeals on its claim that an applicant must demonstrate, as the Commission found that Mackay had failed to do here, that tangible benefit to the public would be derived from the authorization. 91 U. S. App. D. C. 289, 294, 201 F. 2d 694, 699, Prettyman, J., dissenting.

We granted certiorari because this case, the first in which the grant of duplicate radiotelegraph circuits has been challenged in the courts, presents an issue of primary importance in authorization, under the Federal Communications Act of 1934, of international radiotelegraph circuits. 345 U. S. 902.

With the chaotic scramble for domestic air space that developed soon after the First World War, Congress recognized the need for a more orderly development of the air waves than had been achieved under prior legislation.[1] Although the Radio Act of 1912 had forbidden the operation of radio apparatus without a license from the Secretary of Commerce and Labor, judicial

---

[1] A brief outline of earlier federal regulation of radio and wire communication is given in Administrative Procedure in Government Agencies, Monograph of the Attorney General's Committee on Administrative Procedure, S. Doc. No. 186, 76th Cong., 3d Sess., Part 3, 81–84. Early executive and legislative action regarding the laying of foreign cables is reviewed in 22 Op. Atty. Gen. 13 (1898).

decision left him powerless to prevent licensees from using unassigned frequencies, to restrict their transmitting hours and power, or to deny a license on the ground that a proposed station would necessarily interfere with existing stations.[2]   See *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 212.   Congress thereupon, in the Radio Act of 1927, created the Federal Radio Commission with wide licensing and regulatory powers over interstate and foreign commerce.

Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.   In choosing among applicants, the Commission was to be guided by the "public interest, convenience, or necessity," a criterion we held not to be too indefinite for fair enforcement.   *New York Central Securities Corp.* v. *United States,* 287 U. S. 12.   The statutory standard no doubt leaves wide discretion and calls for imaginative interpretation.   Not a standard that lends itself to application with exactitude, it expresses a policy, born of years of unhappy trial and error, that is "as concrete as the complicated factors for judgment in such a field of delegated authority permit."   *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 138.

Congress might have made administrative decision to license not reviewable.   Although it is not suggested—or implied by the grant of power to review—that Congress could not have reserved to itself or to the Commission final designation of those who would be permitted to utilize the air waves, precious as they have become with technological advance, it has not done so.   On the other hand, the scope of this Court's duty to review administrative determinations under the Federal Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.,*

---

[2] See *Hoover* v. *Intercity Radio Co.,* 52 App. D. C. 339, 286 F. 1003; *United States* v. *Zenith Radio Corp.,* 12 F. 2d 614; 35 Op. Atty. Gen. 126.

has been carefully defined. Ours is not the duty of reviewing determinations of "fact," in the narrow, colloquial scope of that concept. Congress has charged the courts with the responsibility of saying whether the Commission has fairly exercised its discretion within the vaguish, penumbral bounds expressed by the standard of "public interest." It is our responsibility to say whether the Commission has been guided by proper considerations in bringing the deposit of its experience, the disciplined feel of the expert, to bear on applications for licenses in the public interest.

In this case, the Court of Appeals has ruled that the Commission was guided by a misinterpretation of national policy, in that it thought that the maintenance of competition is in itself a sufficient goal of federal communications policy so as to make it in the public interest to authorize a license merely because competition, *i. e.,* duplication of existing facilities, was "reasonably feasible." RCAC relies on the holding of the Court of Appeals that the Commission must decide, in the circumstances of the application, that competition is not merely feasible but beneficial.

The Commission has not in this case clearly indicated even that its own experience, entirely apart from the tangible demonstration of benefit for which RCAC contends, leads it to conclude that competition is here desirable. It seems to have relied almost entirely on its interpretation of national policy. Since the Commission professed to dispose of the case merely upon its view of a principle which it derived from the statute and did not base its conclusion on matters within its own special competence, it is for us to determine what the governing principle is. Cf. *Federal Radio Comm'n* v. *Nelson Bros. Co.,* 289 U. S. 266, 276.

That there is a national policy favoring competition cannot be maintained today without careful qualification.

It is only in a blunt, undiscriminating sense that we speak of competition as an ultimate good. Certainly, even in those areas of economic activity where the play of private forces has been subjected only to the negative prohibitions of the Sherman Law, this Court has not held that competition is an absolute. See *Chicago Board of Trade* v. *United States,* 246 U. S. 231; cf. Mason, Monopoly in Law and Economics, 47 Yale L. J. 34.

Prohibitory legislation like the Sherman Law, defining the area within which "competition" may have full play, of course loses its effectiveness as the practical limitations increase; as such considerations severely limit the number of separate enterprises that can efficiently, or conveniently, exist, the need for careful qualification of the scope of competition becomes manifest. Surely it cannot be said in these situations that competition is of itself a national policy. To do so would disregard not only those areas of economic activity so long committed to government monopoly as no longer to be thought open to competition, such as the post office, cf., *e. g.,* 17 Stat. 292 (criminal offense to establish unauthorized post office; provision since superseded), and those areas, loosely spoken of as natural monopolies or—more broadly—public utilities, in which active regulation has been found necessary to compensate for the inability of competition to provide adequate regulation. It would most strikingly disregard areas where policy has shifted from one of prohibiting restraints on competition to one of providing relief from the rigors of competition, as has been true of railroads. Compare, *e. g., United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, and *United States* v. *Joint Traffic Assn.,* 171 U. S. 505, with the Transportation Act of 1920, 41 Stat. 456, 480; *Consolidation of Railroads,* 63 I. C. C. 455.

Federal legislation affecting railroads is a familiar but far from unique example of those many areas of economic

activity in which serious inroads have been made on an original policy favoring competition. Indeed, as to the industry before us in this case, there has been serious qualification of competition as the regulating mechanism. The very fact that Congress has seen fit to enter into the comprehensive regulation of communications embodied in the Federal Communications Act of 1934 contradicts the notion that national policy unqualifiedly favors competition in communications. The Act by its terms prohibits competition by those whose entry does not satisfy the "public interest" standard. In this field, the reason for such restriction undoubtedly lies primarily in the limited availability of international communication facilities, recognized in a series of international conventions.[3] Other considerations may also have applied: Congress may have considered the possible inconvenience to the public of duplicate facilities—as would more clearly be the case with telephones—or the possible inadequacy of the demand for international communications to make more than one enterprise economically or socially desirable. Whatever the reasons, they are not for us to weigh; it is for us to recognize that encouragement of competition as such has not been considered the single or controlling reliance for safeguarding the public interest.[4]

Of course, the fact that there is substantial regulation does not preclude the regulatory agency from drawing on competition for complementary or auxiliary support. Satisfactory accommodation of the peculiarities of individual industries to the demands of the public interest necessarily requires in each case a blend of private forces

---

[3] See Donovan, The Origin and Development of Radio Law, 21–26.

[4] We need not in this case attempt to suggest with any precision where the balance is struck. Certainly the presence of §§ 313 and 314 in the Act, prohibiting certain restrictions on competition, indicates the relevance of some competitive criteria, although it hardly directs the Commission to rely on "competition."

and public intervention. The Commission itself has recognized as much by its changing policy toward authorization of duplicate facilities.[5]   But this merely reinforces our conclusion that it is improper for the Commission to suppose that the standard it has adopted is to be derived without more from a national policy defined by legislation and by the courts.   Had the Commission clearly indicated that it relied on its own evaluation of the needs of the industry rather than on what it deemed a national policy, its order would have a different foundation.   There can be no doubt that competition is a relevant factor in weighing the public interest.   Cf. *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 86–88.   Our difficulty arises from the fact that while the Commission recites that competition may have beneficial effects, it does so in an abstract, sterile way.[6]   Its opinion relies in this case

---

[5] See Brief for Commission, p. 6: "From 1934 until 1939, when radiotelegraph was just emerging from its infancy, the Commission generally denied applications for circuits to countries already served by other American radiotelegraph carriers.   From 1939 to 1942 the Commission generally granted applications for new circuits, regardless of whether the points involved were served by an existing radiotelegraph circuit.   From 1942 to 1943 an affirmative policy of authorizing duplicating American circuits (a 'duplicate circuit policy') was followed as a war measure at the behest of the Defense Communications Board.   From 1943 until 1945, also as a war measure, the reverse course (a 'single circuit policy') was followed at the behest of the Board of War Communications (the successor of the Defense Communications Board).

"From 1945 until the decision in the present case (1951) the Commission granted a number of duplicating circuits." (Citations and footnotes omitted.)

[6] The Commission stated in its opinion: "Competition can generally be expected to provide a powerful incentive for the rendition of better service at lower cost.   Those seeking the patronage of customers are spurred on to install the latest developments in the art in order to improve their services or products, and in order to

not on its independent conclusion, from the impact upon it of the trends and needs of this industry, that competition is desirable but primarily on its reading of national policy, a reading too loose and too much calculated to mislead in the exercise of the discretion entrusted to it.

To say that national policy without more suffices for authorization of a competing carrier wherever competition is reasonably feasible would authorize the Commission to abdicate what would seem to us one of the primary duties imposed on it by Congress. And since we read the opinion of the Commission as saying precisely that, we think the case must be remanded for its reconsideration. We therefore do not say that authorization of Mackay under all the relevant circumstances, including the significance the Commission may rightly attribute to the facts on the basis of its experience, may not be in the public interest.[7]

---

enable them to reduce expenses and thereby lower their rates or prices. The benefits to be derived from competition should, therefore, not be lightly discarded." R. 623. Surely one cannot conclude from this bare statement that the Commission, whatever undisclosed awareness it may have of the problem, has sufficiently laid bare its mind to enable us to perform our reviewing function. And it is certainly not for us to say, at least in the first instance, that authorization would be desirable in these circumstances.

[7] We need not stop to consider RCAC's argument that a prior decision of the Commission, the so-called *Oslo* decision, affirmed by the Court of Appeals for the District of Columbia Circuit, stands in the way. *Mackay Radio & Tel. Co.* v. *F. C. C.,* 68 App. D. C. 336, 97 F. 2d 641. Although in that case the facts were similar to those here, the Commission there decided that duplicate facilities should not be authorized. In affirming, the Court of Appeals simply affirmed that competition is not necessarily in the public interest, not that it is never in the public interest. The Court stated: "Appellant contends that the Commission committed error of law in' failing to interpret 'public convenience, interest or necessity' as necessarily requiring the licensing of a competing radio circuit to Norway so as to end what appellant describes as the monopoly of RCAC." 68 App. D. C., at 337, 97 F. 2d, at 642. It concluded, "In our opinion,

We think it not inadmissible for the Commission, when it makes manifest that in so doing it is conscientiously exercising the discretion given it by Congress, to reach a conclusion whereby authorizations would be granted wherever competition is reasonably feasible. This is so precisely because the exercise of its functions gives it accumulating insight not vouchsafed to courts dealing episodically with the practical problems involved in such determination. Here, however, the conclusion was not based on the Commission's own judgment but rather on the unjustified assumption that it was Congress' judgment that such authorizations are desirable. Cf. *Texas & Pac. R. Co.* v. *Gulf, C. & S. F. R. Co.*, 270 U. S. 266, 277.

In reaching a conclusion that duplicating authorizations are in the public interest wherever competition is reasonably feasible, the Commission is not required to make specific findings of tangible benefit. It is not required to grant authorizations only if there is a demonstration of facts indicating immediate benefit to the public. To restrict the Commission's action to cases in which tangible evidence appropriate for judicial determination is available would disregard a major reason for the creation of administrative agencies, better equipped as they are for weighing intangibles "by specialization, by insight gained through experience, and by more flexible procedure." *Far East Conf.* v. *United States,* 342 U. S. 570, 575. In the nature of things, the possible benefits of competition do not lend themselves to detailed fore-

---

the Commission did not err as matter of law in refusing to treat 'public interest, convenience or necessity' as requiring, by definition, the licensing of appellant." 68 App. D. C., at 339, 97 F. 2d, at 644. We think the precise holding of that case rather supports our conclusion in this case. See Prettyman, J., dissenting below, 91 U. S. App. D. C., at 294, 295, 201 F. 2d, at 699, 700.

cast, cf. *Labor Board* v. *Seven-Up Co.*, 344 U. S. 344, 348, but the Commission must at least warrant, as it were, that competition would serve some beneficial purpose such as maintaining good service and improving it. Although we think RCAC's contention that an applicant must demonstrate tangible benefits is asking too much, it is not too much to ask that there be ground for reasonable expectation that competition may have some beneficial effect. Merely to assume that competition is bound to be of advantage, in an industry so regulated and so largely closed as is this one, is not enough.

RCAC asks us to uphold the Court of Appeals decision on another ground, that the grant of authorization to Mackay would violate § 314 of the Communications Act, which forbids common ownership, control or operation of radio and cable in international communication whose purpose or effect may be substantially to lessen competition, restrain commerce or unlawfully to create a monopoly. We cannot agree. There has been in recent years a considerable shift of international telegraph traffic from cable to radio, a shift strongly accentuated in some countries, including Portugal and The Netherlands, where the overseas correspondent of American companies is a government-controlled monopoly which strongly advocates radio transmission. RCAC, in the two instances before us, is the beneficiary of this discrimination against cable transmission; with negligible exception, it has a monopoly of radio traffic to these countries. In the light of these circumstances, we think the Commission was justified in finding that the grant of Mackay's authorization would increase, rather than decrease, competition. Although it may be true that the relationship of Mackay to Commercial is such that there is, and would be, no competition between them, we think the Commission was entitled to look at the entire competitive scene and not confine itself

to one aspect of it. Mackay and its affiliated cable company had a smaller share of traffic in 1947 than either RCAC or Western Union not only with Portugal and The Netherlands but also with the entire European area. That this authorization would better enable the Mackay system to compete with RCAC and Western Union, and would break up RCAC's monopoly of radio traffic with these countries, seems to us an adequate basis for the Commission's findings under § 314.

RCAC's arguments based on comparable language in the Clayton Act and on decisions under that Act and under the Sherman Law cannot, we think, be sustained. What may substantially lessen competition in those areas where competition is the main reliance for regulation of the market cannot be automatically transplanted to areas in which active regulation is entrusted to an administrative agency; for reasons we have indicated above, what competition is and should be in such areas must be read in the light of the special considerations that have influenced Congress to make specific provision for the particular industry. We therefore think that the Commission's determination that the grant of authorization to Mackay would not decrease competition, in the special sense in which that word is to be used in this context, is supported by the findings and satisfies the requirements of § 314.

For the reasons we have indicated, the judgment of the Court of Appeals is vacated and the case is remanded to that court with instructions to remand it to the Federal Communications Commission for such disposition as is open under this opinion.

*It is so ordered.*

MR. JUSTICE BLACK is of the opinion that the Commission's findings have substantial evidential support, that the findings adequately support the Commission's

order, that the judgment of the Court of Appeals should be reversed and that the Commission's order should be affirmed.

MR. JUSTICE REED and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

I agree with the Court that it is necessary under the Federal Communications Act to establish that the licensing of a competitive service offers a reasonable expectation of some beneficial effect, measured by the public interest. That was indeed the view of the Court of Appeals. But on this record the facts are that

—existing facilities are in excess of those required to handle present and expected traffic;

—the proposed operations will redistribute present traffic rather than generate new traffic;

—the proposed service will not lower rates nor speed up transmission nor improve the existing service in any respect;

—the proposed service will aid Mackay financially and be detrimental to RCA;

—this is a field where without the proposed service there is active competition and an excess of facilities to meet present or expected needs.

I therefore agree with Judge Edgerton's opinion for the Court of Appeals (91 U. S. App. D. C. 289, 201 F. 2d 694) that on this showing the Commission acted without authority and that its order should be set aside. On the record before us the facts are so unequivocal that there is no apparent way for the Commission to meet the standard approved both here and below. There is therefore no occasion for a remand. I would affirm the judgment below.