**HAWAIIAN TELEPHONE COMPANY,**
Petitioner,

v.

**FEDERAL COMMUNICATIONS
COMMISSION**
and

**The United States of America,**
Respondents.
No. 73-1018.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1974.

Decided May 3, 1974.

Thomas J. O'Reilly, for petitioner.

Gregory M. Christopher, Counsel, F. C. C., with whom John W. Pettit, Gen. Counsel, Joseph A. Marino, Associate Gen. Counsel, F. C. C., and Howard E. Shapiro, Atty. Dept. of Justice, were on the brief, for respondents.

Alan Y. Naftalin, Washington, D. C., for intervenor.

Before ROBINSON, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Hawaiian Telephone Company [HTC] seeks review of an order of the Federal Communications Commission granting authority to RCA Global Communications, Inc. [RCA] to provide private-line voice-only telephone service between the United States Mainland and Hawaii. We find that the FCC did not comply with its statutory mandate, and therefore remand to the FCC for further action in conformity with our opinion.

## I. THE NATURE OF COMMUNICATIONS SERVICE TO HAWAII

At issue is the nature and scope of communications service to be available between the U. S. Mainland and Hawaii. Service is usually categorized as either voice-only, which is the traditional telephone service, or record, which includes telegraph, teletype, facsimile, data, alternate voice/data, and simultaneous voice/data. Both the record and voice-only service can utilize two systems of charges: the message system, where a charge is made for each use, or the

leased channel system, where payment of a flat rate provides unlimited service.

On the Mainland to Hawaii route several carriers historically have provided a variety of service. Before 1955 AT&T provided voice-only service on the route; in contrast, RCA and two others provided record services. After a U.S. Defense Department request in 1955 for construction of an oceanic cable along the route, AT&T along with HTC agreed to construct the cable on the condition that they could also supply record service. The FCC granted AT&T permission, on the grounds that harm to RCA would be minor, as compared with great national defense needs.[1] Apparently as a *quid pro quo*, RCA was licensed in 1959 to provide voice service to Hawaii on a leased channel basis;[2] however, RCA did not utilize its license, but surrendered it in 1965.[3]

In 1965 RCA was joined by ITT and Western Union International [WUI] in objecting to the Data-Phone service recently introduced by AT&T in conjunction with HTC.[4] RCA also sought withdrawal of permission for AT&T to provide record service, apparently in an attempt to create the competitive situation usually found elsewhere. Normally on international routes AT&T is limited to providing voice-only service and cannot compete with RCA for record service. The FCC denied RCA the relief sought from competition in record services.[5]

RCA and ITT petitioned 'the FCC in 1966 to expand their Datel service to make it competitive with AT&T and HTC's Data-Phone. Under the originally authorized Datel service, voice communication was limited to cues such as those to start or stop transmission. RCA and ITT's petitions to expand Datel to allow conversation as well as transmission of data were granted by the FCC.[6]

Later in 1966 RCA sought authority from the FCC to lease and operate satellite channels from the Communications Satellite Corporation [COMSAT]. While at first RCA only desired to use the satellite channels to provide service similar to that provided by radio and cable, RCA subsequently applied for permission to use the channels for leased channel voice-only service. This was a departure from RCA's previous provision of service, and was opposed by HTC and AT&T. After comments by the interested carriers, the FCC authorized RCA temporarily to lease and operate the satellite channels, but limited to record type service. No permanent action was undertaken at that time.

In 1969 RCA petitioned for permanent approval of its satellite channel leases, to be used for both record and voice-only services, and requested additional satellite leases. Again HTC and AT&T objected, but no agency action occurred until 8 June 1972, when the Telegraph Committee of the FCC adopted a memorandum order granting RCA permanent authority to provide voice-only and record service via satellite facilities. HTC then sought review by the full FCC. On 13 November 1972 the FCC denied HTC's application for review and affirmed the order of the Telegraph Committee.[7] HTC then lodged an appeal pursuant to 47 U.S.C. § 402 challenging the FCC approval of RCA voice-only services.

1. American Telephone & Telegraph Co., 8 Pike & Fisher RR 1217 (1955).

2. AT&T–RCA Communications, Inc., 27 F.C.C. 271, 322 (1959).

3. *See* RCA Global Communications, Inc., 37 F.C.C.2d 1043, 1044 (1972).

4. Data-Phone service involves transmission of data over normal message telephone facilities.

5. American Telephone & Telegraph, 38 F.C.C. 1222 and 1 F.C.C.2d 374 (1965). *See* RCA Global Communications, Inc., 37 F.C.C. at 1046–47.

6. ITT World Communications, Inc., 2 F.C.C. 2d 573 (1966).

7. RCA Global Communications, Inc., 37 F.C.C.2d 1043.

## II. THE STATUTORY REQUIREMENTS FOR FCC APPROVAL OF RCA'S NEW SERVICE

The issue before the court is whether the FCC has complied with statutory requirements when it approved RCA's application for voice-only service. We find that the FCC has not conformed to the requirement that it find the public convenience and necessity dictate the new service. We remand to the FCC for reconsideration and articulation of this most significant factor. In so doing, we make no suggestion whatsoever as to how we might find that the public interest might best be served.

The Communications Act of 1934, 47 U.S.C. § 214(a), requires that before a carrier undertakes to construct or operate a new line it must obtain from the FCC certification "that the present or future public convenience and necessity require or will require" the new service. The rules of the FCC regarding applications for certification carry forward the statutory mandate by requiring that applications include a "summary of the factors showing the public need for the proposed facilities," [8] and a description of current service and "reasons why existing facilities are inadequate." [9]

## III. ACTION AND OPINION OF THE COMMISSION

In granting RCA certification the FCC necessarily approved RCA's application, which nowhere specified or summarized factors demonstrating public need for additional services. RCA simply noted on its amended application that HTC and AT&T had applied for satellite facilities to complement their cable voice-only service to Hawaii, and that RCA also wished to be enabled to provide leased channel voice-only service via satellite.[10]

Not surprisingly, AT&T and HTC opposed RCA's application. In its reply RCA noted the exclusive authority of those two carriers to furnish leased channel voice service via cable, and suggested the exclusivity should not be extended to satellite service. RCA suggested that in view of its "historical role" and "equity" it should be permitted to provide the new service.[11] RCA's update of its application, which was filed in May 1969, did not add any statement regarding public necessity.

The tenor of the RCA application, approved by the FCC, and the subsequent exchange of views illustrate a major defect we discern in the Commission's unanalytical approach to its responsibilities. Not only did the FCC place a value unsupported by the record on the virtues of competition, but the FCC really focused on equalizing the position of competitors. This is true in the FCC action made the subject of this review; it is also apparent in the whole history of Hawaii-Mainland communications detailed above. We shall see more of this below.

The Telegraph Committee approved RCA's application for satellite voice service on 9 June 1972. Its memorandum opinion recited the points made by the various carriers and noted that, unlike the case of other international routes, competition concerning record service on the Hawaii routes existed between RCA and other international record carriers on the one hand, and AT&T and HTC on the other hand. Citing *ITT World Communications, Inc.*,[12] the Committee concluded it would "be equitable and in the public interest" [13]

8. 47 C.F.R. § 63.01(*l*).

9. 47 C.F.R. § 63.01(n).

10. *See* Joint Appendix at 8–10. The original application did not deal with voice-only service, but simply sought satellite rather than cable transmissions of types of services already approved. *See* application in Joint App. at 1–7. RCA did mention public interest once: it concluded that individual television transmission would be better for the public than rotation television transmission. RCA also noted that there was a shortage of cable circuits vis-à-vis demand. This latter factor helps to establish a need for satellite service in general.

11. *See* Joint App. at 22–23.

12. 2 F.C.C.2d 573 (1966).

13. Joint App. at 47.

to allow RCA to compete with AT&T and HTC on leased channel voice service. This conclusion, the Committee felt, was supported by the "past precedent" of an authorized voice-only service via radio which had been granted to RCA but never utilized, and by the fact that the economic impact on AT&T and HTC would be minimal. The Committee then concluded that RCA "has shown a need for the facilities" and that approval of the application "will serve the present and future public convenience and necessity," [14] and granted RCA the certificate.

Upon review the FCC affirmed the Telegraph Committee grant. The Commission relied on its decision in *ITT World Communications, Inc.*, in which it allowed ITT to provide Datel to Hawaii because of the previously favored position of AT&T and HTC in providing Data-Phone. Since the Telegraph Committee opinion followed the "policy and precedent" of the *ITT* decision, the Commission concluded it would be "equitable" to give RCA the certificate desired, absent a showing of serious adverse effect on HTC and AT&T.[15]

The Commission noted the relative advantage of AT&T and HTC by being able to provide both record and voice service. It believed that competition was "reasonably feasible" in the voice-only market, and stated,

> Insofar as public benefit is concerned, it is sufficient to note that wherever competition has been introduced we have found considerable benefit in the way of better service, responsiveness to public demand, and generally lower rates with substantial increases in volume and often profitability. We anticipate that a similar benefit may appear in the instant case.[16]

Then, after determining that the effect on HTC revenue would be minimal, the FCC briefly referred again to the public interest:

> even on HTC's own ground of comparison [re revenue loss], competition is reasonably feasible and as noted above, our experience with this area leads us to believe that it can benefit the public in both charges and quality of service.[17]

Finally, the Commission noted

> a further public benefit—that stemming from the viability of the record carriers which we sought to protect . . . . [18]

This then is the sum total of Commission attention given to public necessity and convenience. In effect, the Commission's analysis proceeds as follows:

(1) Competition is reasonably feasible, because figures show that HTC will not lose much revenue.

(2) Whenever competition has been introduced, the FCC has found public benefit through better service, lower rates, etc.

(3) Such a benefit is anticipated here.

(4) And this will help the viability of record carriers.

(5) Therefore the FCC finds the public convenience and necessity standard has been met.

## IV. THE COMMISSION'S ACTION AND SUPPORTING RATIONALE DOES NOT MEET THE STATUTORY STANDARD

■ Looming large in the Commission's rationale, indeed, undeniably the key factor in its decision, is competition. Competition as a factor might have some relevance to the FCC decision, if competition had been shown to be of benefit to the public on the communication routes in question. Yet it is all too embarrassingly apparent that the Com-

---

14. *Ibid.*

15. Joint App. at 89, 37 F.C.C.2d at 1047.

16. Joint App. at 90, 37 F.C.C.2d at 1048–49 (citations omitted).

17. Joint App. at 91, 37 F.C.C.2d at 1049.

18. Joint App. at 92, 37 F.C.C.2d at 1049.

mission has been thinking about competition, not in terms primarily as to its benefit to the public, but specifically with the objective of equalizing competition among *competitors*.

This is *not* the objective or role assigned by law to the Federal Communications Commission. As a result of focusing first on competitors, next on competition, and then on the public interest, the FCC has given scant attention to the question of public convenience and necessity, and therefore has not met its statutorily imposed duty.

Its finding of public convenience and necessity essentially is based on two factors: (1) the history of the route and relative competitive positions of the carriers; and (2) the benefits of competition in general. The first factor is of little relevance in determining whether the public interest test is satisfied. The second factor has not been particularized beyond a general assertion by the FCC. We remand to the FCC so that they can consider the *public interest* perhaps to be served by competition on this particular route.

The statutory standard of public convenience and necessity has been explicated by the Supreme Court in the seminal case of FCC v. RCA Communications, Inc.[19] In the opinion for the Court, Justice Frankfurter succinctly put the Commission's duty:

> In the nature of things, the possible benefits of competition do not lend themselves to detailed forecast, but the Commission must at least warrant, as it were, that competition would serve some beneficial purpose such as maintaining good service and improving it. Although we think RCAC's contention that an applicant must demonstrate tangible benefits is asking too much, it is not too much to ask that there be ground for reasonable expectation that competition may have some beneficial effect. *Merely to assume that competition is bound to be of advantage, in an industry so regulated and so largely closed as this one, is not enough.*[20] .

The Commission has not fulfilled the limited requirements set forth in *RCA*; it has done little more than assume that competition is likely to be advantageous. The "evidence" that is proffered by the Commission to support this assumption is not conclusive or even relevant. The court recognizes that the history of the traffic from the U. S. Mainland to Hawaii demonstrates that this route has been an exceptional one, in which competition has been allowed in several areas where ordinarily it is not. However, the statute says plainly that the test for certification of new lines is the public benefit; the test is not whether competition has been allowed in the past, nor is the test whether the balance of equities and opportunities among competing carriers suggests a change.

When the FCC considers an application for certification of a new line, it must start from the situation as it then exists, and must apply the statutory standard to determine whether indeed the public convenience and necessity requires more or better service. If it determines that more or additional competitive service would be in the public interest, then it can consider how much added service is necessary, and finally to whom the opportunity for providing service should be awarded. In this latter determination the Commission can balance equities and opportunities among the various carriers. The initial question for the Commission, however, must be whether the public interest requires more or different service.

Competition is without doubt a factor to be weighed in determining where the public interest lies.[21] However, the FCC cannot merely assert the benefits of competition in an abstract, sterile way.[22] The Commission has done

---

19. 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953).

20. *Id.* at 96–97, 73 S.Ct. at 1005 (emphasis supplied; citation omitted).

21. *See* FCC v. RCA Communications, Inc. 346 U.S. at 94, 73 S.Ct. 998.

22. *Ibid.*

little more than it did in the RCA case, where its opinion states,

> Competition can generally be expected to provide a powerful incentive for the rendition of better service at lower cost. Those seeking the patronage of customers are spurred on to install the latest developments in the art in order to improve their services or products and in order to enable them to reduce expenses and thereby lower their rates or prices. The benefits to be derived from competition should, therefore, not be lightly discarded.[23]

The Supreme Court found this treatment inadequate, noting,

> Surely one cannot conclude from this bare statement that the Commission, whatever undisclosed awareness it may have of the problem, has sufficiently laid bare its mind to enable us to perform our reviewing function. And it is certainly not for us to say, at least in the first instance, that authorization would be desirable in these circumstances.[24]

■■ The whole theory of licensing and regulation by government agencies is based on the belief that competition cannot be trusted to do the job of regulation in that particular industry which competition does in other sectors of the economy. Without in any way derogating the merits of the competitive free enterprise system in the economy as a whole, we cannot accept the action of the FCC here in a tightly regulated industry, supported by an opinion which does no more than automatically equate the public interest with additional competition.[25] Of course, we recognize that the FCC may draw upon competition "for complementary or auxiliary support." [26]

## V. REMAND

■ We remand to the Commission for reconsideration of its decision. We imply no inference as to what that decision should be. But if on reconsideration its conclusion remains the same, it must "at least warrant" that competition will serve some beneficial public interest here. While the Commission need not make "specific findings of tangible benefit" it must go beyond its bare assertion of benefit.[27] It must provide the basic facts which lead it to reach its conclusion of public benefit from the decision. If such basic facts have not been developed in the prior agency proceedings and record, then hearings or supplemental inquiry may be necessary.[28]

■ Following the Supreme Court in *RCA, supra,* and other decisions, this court has long required that agencies present sufficient support for their conclusions in order that the court can properly review their decision.[29] The court, and the parties, must not be left with *post hoc* rationalizations by counsel

23. *See id.* at 94–95, n. 6, 73 S.Ct. at 1004.

24. *Id.* at 95, n. 6, 73 S.Ct. at 1004.

25. *See* Mackay Radio & Telegraph Co. v. FCC, 68 U.S.App.D.C. 336, 97 F.2d 641 (1938).

26. FCC v. RCA Communications, Inc., 346 U.S. at 93, 73 S.Ct. 998.

27. *See* text at n. 20 *supra.*

28. No evidentiary hearings were held by the FCC. *See* HTC Brief at 5.

29. As we wrote in Public Service Commission of New York v. FPC, 141 U.S.App.D.C. 174, 177, 436 F.2d 904, 907 (1970),
The Commission's decision and the rationale supporting it may be entirely valid, but the Commission cannot take refuge in its alleged expertise in this field, when it does not set forth convincing reasons for its

determination in sufficient detail to allow the validity of those reasons to be critically examined by the parties adversely affected and to allow this Court to pass on the reasonableness of the Commission's conclusions.

Once this is done, the action of the Commission can then, if necessary, be properly reviewed.

*See also* Airline Pilots Association, International v. CAB, 154 U.S.App.D.C. 316, 321–322, 475 F.2d 900, 905–906 (1973); Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971); WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 320, 418 F.2d 1153, 1156 (1969). *See* SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

as the prime authority for the Commission decision.[30]

Therefore, we remand the case to the FCC for prompt reconsideration and further articulation of its decision. We direct the FCC to complete such further work as is necessary and file its opinion within one hundred and twenty days of the date of this decision. Further review, if any, by this court will await the initiative of any party considering itself aggrieved by the forthcoming Commission decision. In the event of an appeal, this panel retains jurisdiction.

So ordered.

---

30. *See* NLRB v. Metropolitan Life Insurance Co., 380 U.S. 438, 442–443, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); National Air Carrier Association v. CAB, 141 U.S.App.D.C. 31, 41, 436 F.2d 185, 195 (1970).