**RCA GLOBAL COMMUNICATIONS, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

and

**ITT World Communications Inc., TRT Telecommunications Corporation and Western Union International, Inc., Intervenors.**

**No. 522, Docket 76–4054.**

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1976.

Decided July 27, 1977.

Opinion on Rehearing Oct. 5, 1977.
See 563 F.2d 1.

H. Richard Schumacher, New York City (Cahill, Gordon & Reindel, Miles M. Tepper, Robert T. Quinn, Jerome Sheinman, New York City, of counsel, Francis J. DeRosa, Charles M. Lehrhaupt of RCA Global Communications, Inc., New York City, of counsel), for petitioner.

Jack David Smith, Washington, D. C. (F. C. C., Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Association Gen. Counsel, and U. S. Dept. of Justice, Washington, D. C., Donald I. Baker, Asst. Atty. Gen., Carl D. Lawson, Atty., James F. Ponsoldt, Atty., Washington, D. C., of counsel), for respondent.

Charles P. Sifton, New York City (LeBoeuf, Lamb, Leiby & MacRae, John S. Kinzey, Richard C. Cole, ITT World Communications Inc., New York City, Howard A. White, John A. Ligon, New York City, of counsel), for intervenor, ITT World Communications Inc.

E. Edward Bruce, Washington, D. C. (Covington & Burling, Mark D. Nozette, Washington, D. C., of counsel), for intervenor TRT Telecommunications Corp.

Alan Kolod, New York City (Stroock & Stroock & Lavan, Alvin K. Hellerstein, Henry J. Silberberg, New York City, of counsel, Western Union International, Inc., Robert E. Conn, Roger P. Newell, Washington, D. C., of counsel), for intervenor Western Union International Inc.

Before MOORE, FEINBERG and GURFEIN, Circuit Judges.

MOORE, Circuit Judge:

Petitioner, RCA Global Communications, Inc. ("RCA") by its petition seeks to review and set aside, in part, a "Report and Order and Notice of Proposed Rulemaking" issued on January 7, 1976 by the Federal Communications Commission (the "Commission" or "FCC") which, in substance, purported to strike down a formula (sometimes referred to as the "international formula") which had been created in, and utilized since, 1943 when such a formula was deemed necessary to insure a fair distribution of unrouted international telegraph traffic and thus avoid possible monopoly power in the Western Union Telegraph Company ("WU") as a result of its merger with Postal Telegraph Cable Company ("Postal"). To make this merger possible, Congress added Section 222 to the Communications Act ("the Act"), 47 U.S.C. § 151 et seq.

Supplemental to the Order of January 7, 1976 is a Memorandum Opinion and Order issued on September 27, 1976 and based upon petitions (1) by RCA for a stay pending review of the January 7, 1976 Order by this court; (2) by Western Union International, Inc. ("WUI"); (3) by WU for an extension of time; and (4) by WU for clarification.

Two paragraphs of Section 222 are pertinent to the issues before us. Paragraph (e)(1) provides that Western Union

". . . distribute among the international telegraph carriers, telegraph traffic by wire or radio destined to points without the continental United States, and divide the charges for such traffic, in accordance with such just, reasonable, and equitable formula in the public interest as the interested carriers shall agree upon and the Commission shall approve . . ."

Pursuant to this directive the international formula was evolved. Any modification of this formula was to be as provided in paragraph (e)(3):

"(3) Whenever, *upon a complaint* or upon its own initiative, *and after a full hearing, the Commission finds* that any such distribution of telegraph traffic among telegraph carriers, or any such division of charges for such traffic, which is being made or which is proposed to be made, *is or will be unjust, unreasonable, or inequitable, or not in the public interest*, the Commission shall by order prescribe the distribution of such telegraphic

traffic, or the division of charges therefor, *which will be just, reasonable, equitable, and in the public interest,* and will be, so far as is consistent with the public interest, in accordance with the existing contractual rights of the carriers." (Emphasis added).

Congress thus specified a distribution formula with Commission approval as a premerger condition. Its purpose was to "prevent WU from favoring itself" in the routing of messages. The parties were to agree upon a formula, if possible. After an agreement had been reached it was submitted to the Commission for review. Upon review, the Commission modified the formula in certain respects. For this reason the Commission regarded the formula as "prescribed" by it rather than merely "approved". Joint Appendix ("JA") 4, n.5. This formula without major changes or modifications had remained in effect for some thirty-three years. The object of the formula was, "by freezing the carriers' premerger positions" and by setting up quotas, to create an equitable situation among the international record carriers ("IRCs"), namely, those companies carrying messages overseas in contrast to WU's domestic service.

WU is the only domestic carrier which receives messages from the public. The messages fall into two categories: (1) "routed" wherein the customer specifies a particular IRC which he wishes to transmit his message overseas; and (2) "unrouted" wherein the particular IRC is not designated.

Congress, as part of the merger legislation, specifically provided with respect to "distribution of telegraph traffic among telegraph carriers or any division of charges therefor" that if, after a full hearing, the Commission finds that either of them

". . . is or will be unjust, unreasonable, or inequitable, or not in the public interest, the Commission shall by order prescribe the distribution of such telegraphic traffic, or the division of charges therefor, which will be just, reasonable,

equitable and in the public interest . . . ." 47 U.S.C. § 222(e)(3). Initiation of any such proceeding was to be "upon a complaint or upon its [the Commission's] own initiative."

This proceeding's ancient history is irrelevant except for the brief comment that by a complaint dated November 25, 1964 ITT World Communications, Inc. ("ITT") (also an IRC) sought a revision of the formula. Thereafter and through 1965 various IRCs submitted statements and comments thereto, including parties (intervenors) to this appeal, WUI (a company formed to handle overseas messages because of the requirement that WU divest itself of its cable operations) and TRT Telecommunications Corporation ("TRT").

For all practical purposes, the proceeding remained dormant until November 1973 when the Commission issued an order [1] instituting an investigation to determine whether the distribution of telegraph traffic handled by WU was within the statutory language of unjust, unreasonable, etc., and if so, what the Commission should do about it. In addition to ITT, RCA, WUI, TRT and WU, The French Telegraph Cable Co., Canadian National Railway Co., Canadian Pacific, Ltd., and United States-Liberia Radio Corporation were made parties respondent. A timetable was set up for the filing of statements of fact, memoranda of law, responses and replies.

This the respondents, RCA, ITT, WUI and TRT, did in great volume. (JA 169–672). There were statements of position, replies to each others, comments, supplemental comments and further replies thereto. Throughout RCA demanded an oral hearing to develop facts, albeit on many occasions RCA presented by memoranda and/or affidavits its views. The record before us discloses at least thirty-three separate statements arguing the parties' respective causes. Out of this impressive array of fact and argument came a final decision by the Commission released on January 7, 1976 supplemented by a decision released on September 27, 1976.

---

1. 43 F.C.C.2d 1174 (1973).

For present appellate review purposes this mass of material can be distilled down to the two points which RCA urges as entitling it to have the Commission's order of January 7, 1976 vacated and set aside and the case remanded to the Commission for appropriate further proceedings, namely, that "The Commission's 'Notice-and-Comment' Procedure Did Not Afford RCA [Globcom] the 'Full Hearing' to Which Section 222(e)(3) Entitled It", and "The Commission's Prescription of a New Interim Formula Is Not Supported by Adequate Findings". As a corollary, RCA claims that such findings as are purported to have been made are arbitrary, capricious and unsupported by substantial evidence.

A "full hearing" with its ultimate purpose of developing the facts dispositive of the issues before the adjudicating agency does not necessarily require that such facts be adduced by question and answer interrogation of witnesses giving oral testimony. Such procedure (in many situations possibly old-fashioned) often resulted in thousands of pages of transcript which when analyzed could have been condensed into a comparatively brief narrative. The fairness of the "hearing" depends not only upon the opportunity to answer the facts so adduced, but also to present the adversary's own factual version. The many statements and counter-statements, previously referred to, evidence the extent of the opportunities afforded the parties to present their factual and legal views. Only a few somewhat more specific comments are required.

I.

RCA asserts that it was deprived of the "full hearing" to which it was entitled by § 222(e)(3) of the Act, 47 U.S.C. § 222(e)(3). It insists that a "full hearing" must consist of a "trial-type" proceeding, with an oral presentation of evidence. With this interpretation of the requirements of § 222(e)(3), we disagree and hold that RCA received the "full hearing" to which it was entitled.

Congress' precise intent in requiring a "full hearing" in § 222(e)(3) of the Act

cannot be determined. The statute itself does not contain any further description of the procedures required, and there is no adequate legislative history to aid in clarifying the meaning of the words. The Act was enacted prior to the Administrative Procedure Act and thus the intended meaning of the terms in the prior statute cannot be determined by reference to the later statute, with its detailed descriptions of various levels of "hearings".

RCA contends that the Commission has continually interpreted § 222(e)(3) as requiring a "trial-type" hearing. We need not decide whether the Commission has indeed established such a pattern of interpretation, because such a prior practice would in any case not be dispositive. In interpreting the phrase "opportunity for a hearing" in § 201 of the Act, the Third Circuit stated:

"While we recognize that the Commission has previously extolled the utilization of adjudicative hearings in § 201 proceedings, we do not believe that this 'prior practice' is as significant as is claimed by AT&T. . . . In the absence of a statutory mandate, we see no reason to bind the Commission to this procedural policy. As technology develops and the field of communications changes, procedural, as well as substantive, policy must be flexible. The mere fact that an agency has once regarded evidentiary hearings as appropriate does not bar it from adopting another policy when changing or new circumstances require a different approach."

*Bell Telephone Company of Pennsylvania v. FCC,* 503 F.2d 1250, 1264–65 (3rd Cir. 1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975) (footnote omitted).

The court in *Bell Telephone* went on to hold that in the absence of a clear statutory directive, it would not create a *per se* rule that an evidentiary hearing was required in § 201 proceedings. The facts of each case would determine the type of hearing required.[2] The spread of this flexible ap-

2. The Court noted that a *per se* rule was particularly inappropriate in the case of the FCC:

"[P]rocedural flexibility can aid the FCC in making the substantive determinations that it

proach to the interpretation of the term "hearing" in regulatory statutes is an outgrowth, to a large extent, of the Supreme Court decision in *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). The narrow holding of that case was that the words "after hearing" in the Interstate Commerce Act § 1(14)(a) do not require trial-type proceedings. Judge Friendly of this Court has described the import of the *Florida East Coast* decision as follows:

> "The opinion seems to say that 'hearing' provisions in regulatory statutes, which had long been regarded as requiring trial-type hearings, have been modified by the Administrative Procedure Act so that nothing more than notice and written comment is required if the action falls within the APA's expansive definition of rulemaking, and implicitly, of course, that this comports with due process. The definition of rulemaking is exceedingly broad, about the only limitation being that a rule can have only future effect."

H. Friendly, *"Some Kind of Hearing"*, 123 U.Pa.L.Rev. 1267, 1307 (1975) (footnotes omitted).

 The emphasis, today, in the absence of a specific statutory directive as to the requisite form of hearing, is on the requirements of the particular case, not on formalistic interpretations of statutory words, and not on the equally formalistic and often circular distinction between adjudication and rulemaking. With this in mind, we turn to the facts of the case before us to determine whether the hearing to which the parties were entitled was any different than the one they received.

The Commission had set out in detail the issues to be studied and ordered the parties to file statements of fact and memoranda of law.[3] The International Formula Committee ("IFC") and the International Quota Bureau ("IQB") were made parties for the

purpose of furnishing information in their possession required by the Commission. The Commission stated further that after reviewing the written submissions, it would consider the necessity or desirability of an oral hearing, upon its own or any party's motion.

Prior to the submission of the statements and memoranda, RCA sent the Commission a letter, dated March 11, 1974, informing the Commission of the inadequacy of the IQB's data. RCA asserted:

> "It is now evident that there are no 'facts' on which a decision could be based and accordingly either the parties to the proceeding must determine and agree to the facts on an informal basis outside of the hearing process or, absent the agreement of the parties, an oral evidentiary hearing must be held."

In order to facilitate an informal determination of the facts, RCA informed the Commission that the parties had agreed to share the costs of a statistical study to be conducted by WU. Accordingly, on May 30, 1974, the Commission ordered that this study be conducted.

The Western Union Study was published on June 12, 1975, and on June 16, the IQB issued a summary of the study. After consideration of the study, the parties submitted supplemental comments on August 1, 1975. On August 28, the parties submitted their fifth and final round of responsive comments.

In each of five submissions, RCA devoted one sentence to asserting its right to an oral hearing. It did not give any specific reasons for the necessity of an oral hearing, any necessity for cross-examination, any importance of witness credibility, or any evidence that could only be presented orally. In fact, in its August 1, 1975 submission, it stated that "using the Western Union derived data, [it was able] to compile an

---

is required to make under the Communications Act. To lock the FCC into one type of proceeding—be it evidentiary or otherwise—could jeopardize the ability of the Commis-

sion to determine the 'public interest' in a given case."
503 F.2d at 1265.

**3.** *See also* 47 F.C.C.2d 225 (1974).

*accurate* summary of the effects of the ITT and TRT proposal on RCA Globcom." (JA 510) (emphasis added).

█ Accordingly, we hold that in a proceeding to change prospectively a formula for the distribution of telegraph traffic, a change which will affect many parties, and which is based on complicated economic considerations, particularly susceptible to documentary proof, the requirement of a "full hearing" is satisfied by a "notice and comment" procedure stretching over three years, aided by a lengthy statistical study, and with many written submissions by each of the immediately interested parties.

## II.

█ However, the form of the hearing does not exempt the Commission from the burden of making findings that its interim formula will be just, reasonable, equitable, *and in the public interest*". (Emphasis added). "Interim" is defined as "temporary" or "provisional".[4] Obviously anything on an interim basis looks to something more permanent. That "something" is readily discernible from the Commission's order reflecting its belief that anyone who desires to send a transoceanic telegram *must* specify at the time of delivering the message to be transmitted, the particular carrier (the IRC) by which he or she desires the message sent. This objective is gleaned from such statements as the Commission expects "the parties during this [the interim] period to work out mutually-agreeable procedures for implementation of the all-routed distribution systems so that we can avoid later controversy on this point." (JA 27). The Commission concedes that it cannot move immediately to require customer routing (JA 3) but it agrees "in principle that we should proceed in this new direction". (JA 27) The "interim" period, so states the Commission, is to be used so "that the IRCs will use this period to expand their solicitation efforts, so that the customer routing system will work smoothly and efficiently". (JA 28).

The Commission's determination to abolish the customer's right to merely hand in his message for transmission is clear from its statements that "[i]n place of the present formula, we will place distribution of traffic on the choice of the customer", i. e., "routed" messages, and that in the interim it prescribes "a new formula which distributes unrouted traffic among the IRCs in the same proportions as each carrier handles routed traffic". (JA 3).

The record discloses that in 1974[5] some three million messages were "unrouted" and that of the 3.9 million messages handled by WU, 76.5% were unrouted and 23.5% routed. Thus, as the Commission recognizes, "unrouted traffic continues to represent a substantial portion of outbound traffic and the equitable division is a matter of consequence to the IRCs". (JA 11).

Under the heading "II. Findings: The Present Formula", the Commission has set forth figures which show a substantial disparity in unrouted messages handled by ITT, TRT, WUI and RCA. This disparity arises in the Commission's opinion because the original formula "sought to keep market shares static" in order to achieve a balance between carriers. But for this disparity the Commission states that "[it] cannot ignore the possibility that quality of service could have been improved absent the inequities of the formula" (JA 17) and upon this assumption the Commission concludes that these distortions "are injurious to the public interest and should be eliminated". (JA 17).

The Commission concedes that "the parties were not [on] notice that [it] would consider a requirement for specific routings"; that the parties hereto have not "addressed the legal or economic issues raised thereby"; and that it is "unable at this point to determine the extent of the economic burden which would result from a requirement for specified routings". Nevertheless "[it] agree[s] in principle that

4. Webster's New World Dictionary of the American Language, College Edition (1968).

5. 1974 was the year of the WU study.

[it] should proceed in this direction [namely, 'customers be required to specify the routings']". (JA 27).

The Commission recognized that the 1974 study "indicates that a large number of customers either do not care to route their messages or that they are not familiar with the different IRCs, since three-fourths of WU transfers are unrouted". (JA 27). It admits that "until IRC advertising can become effective, WU employees will be required to provide users with this information", which "may place a substantial burden on WU". (JA 27).

The Commission states that "[n]one of the parties considered the increase in WU's costs which would follow from this expanded role, or the effect of that increase on the users of both domestic and international service". (JA 27). The Commission admits that "instructions and operational arrangements . . . are needed to guide WU in presenting the public a mandatory choice among IRCs" but that "[t]he information now before us [the Commission], however, is insufficient to prescribe those instructions or operating arrangements." (JA 28).

In repealing the original formula directed by Congress to be achieved by agreement among the carriers and approved by the Commission, the Commission "concluded that the public interest . . . will be best served by relying primarily on consumer choice [i. e., routing] for the distribution of traffic among the several international record carriers", but that "[d]ue to certain unresolved questions concerning possible operational, economic and legal implications, [it] will not prescribe that all international telegraph traffic must be specifically routed by the customer". The Commission states that it expects "a more aggressive marketing effort and a consequential reduction in unrouted traffic". Finally, despite protestations that its interim formula is designed to serve the public interest, the Commission solicits "prompt comments concerning the operational, economic, and legal implications of an all-routed distribution in order [to] reach an early decision concerning whether the public interest would be served even better through this means". (JA 35).

Under the interim formula, unrouted messages are to be distributed so that each IRC will receive a volume of such messages which will equal its quota as defined in the formula. The parties were directed to file comments on or before March 26, 1976 with replies by April 23, 1976. The parties, RCA, ITT, TRT and WU were almost unanimous [6] in their comments that an all-routed plan would greatly increase costs, delay efficient service and result in confusion to the members of the public who desired to send telegrams. Particularly stressed is the thought that any such scheme would be highly adverse to the public interest. The views of WU are entitled to particular consideration because it is the originating source of all foreign-bound telegrams in the 50 states. It alone has the initial contact with the customer, namely, the telegram sender. If the all-routed plan contemplated by the Commission is required, the statute requires investigation as to whether it would be "in the public interest". Using the figures of 3 million unrouted messages a year and the assumption based upon comments of the parties that these messages are largely of a social nature and are not sent by any individual more than once or twice a year, well over one million customers would be involved. These messages would all have to be delivered to WU either across the counter by hand or by telephone. If the Commission's plan were to go into effect, the WU operator would have to inquire by what IRC the customer wished the message to be sent. Undoubtedly the customer would not have any idea what these initials stood for so that the operator would have to advise him that they referred to the carrier which transmitted the message abroad. The customer would, in all likelihood, say that he did not care so long as the message was delivered promptly. The operator would then have to inform the customer that he could not take the message unless the customer specified an IRC. This would

---

6. WUI, hoping to capitalize on its name similarity to WU, took a different position.

require informing the customer as to the various IRCs and supplying him with material describing the merits of each. Were the customer to seek the operator's recommendations, this would put into the hands of WU the power to select and specify. The problems (even the absurdities) attendant to this situation have been well described in WUI's comments of May 10, 1976, wherein it said:

> "To ensure that the public makes an informed choice, WUI suggests that each member of the public submitting a message that has not been pre-routed be given a brief pamphlet containing descriptions of the available carriers. This pamphlet could contain six sections, one containing a brief description of the WUTelCo/IRC relationship and the requirement of routing, and one section for each of the five interested carriers, with a description or advertisement written by the carrier concerned." (JA 905).

By such a method WUI states that the customer could "easily and simply be informed". This simple method would require the customer, anxious to have his message immediately transmitted, to read a short history of the WU–IRC relationship, assuming that it could be condensed into a few pages, then read the advertising literature written by each of the other IRCs and after serious cogitation consider which of the IRCs seemed to be the best. Assuming that this could be done in a convenient reading area within an hour, query, would the customer be any better informed? The average customer would be entitled to say in a petulant and indignant way that he came to send a telegram and not to be forced to absorb a history of the transoceanic telegraph industry. Nor would he care whether his message went through the air, by cable under the sea, or bounced off a satellite in outer space.

The Commission has also suggested that the IRCs could inform the public by an intensive advertising campaign of their respective merits. Assuming that it were possible to reach every village and hamlet of the nation by radio, television, newspaper advertising or otherwise, any such program would be quite costly. WU has given a figure of approximately two million dollars. This would add materially to the cost of the messages and be a burden instead of a benefit to the public. Furthermore, in their comments, the IRCs have indicated that such an effort would not be worthwhile economically and that they would be unwilling to spend substantial sums in an attempt to induce potential customers to use their own companies. This phase of an all-routed program has not as yet been considered by the Commission or made the subject of any findings of fact.

Assuming, as we do, that the notice-and-comment procedure is acceptable, there seems to be in the record no comment from the public or anyone who might speak in its behalf on the vital element in the statute, i. e., "public interest". Nor is there any factual showing that the service being rendered is not of the highest quality or that it could be improved by an all-routed scheme. To the contrary, high quality of service is conceded and there is no showing that the carriers have not availed themselves of the most modern technological devices.

The Commission has professed to be acting "to regulate [the carriers] in the public interest" and states that the public is interested "in a rapid, efficient communications service with adequate facilities and reasonable charges" (JA 75) but nowhere in the record is there any proof, much less a finding, that the public is not receiving such service. As to reasonable charges, the statements in the record are that as a result of the Commission's decree the public may be forced to bear higher charges.

Another possible adverse consequence of its decree, which the Commission itself raises, is whether the decree calling for "redistribution of traffic will unreasonably endanger the financial integrity of the carriers to the point that they are unable to adequately serve the public". (JA 75). The Commission recognizes that "[w]ith respect to ITT, TRT and FTC, the interim formula will likely result initially in their receiving increased unrouted traffic and increased

revenues . . . [which would] improve their financial position" and that "[w]ith respect to RCA and WUI, the interim formula does appear likely initially to reduce their message volumes and revenues". (JA 75). The Commission estimates that the projected diversion of revenues is only 6.3% of RCA's net income[7] and that this loss "would not so reduce RCA's revenues as to put it into a loss situation or otherwise damage its ability to serve the public. . . . ." (JA 75–76).

 We find ourselves stymied in attempting to review the adequacy of the above findings of the Commission. Looking to applicable law and precedent, we find two principles well established: first, a reviewing "court's responsibility is not to supplant the Commission's balance of . . . interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors"; and second, "[j]udicial review of the Commission's orders will therefore function accurately and efficaciously *only* if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as· well as its assessment of the consequences of its orders for the character and future development of the industry". *Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968) (emphasis added).

In *Hawaiian Telephone Company v. F.C.C.*, 162 U.S.App.D.C. 229, 498 F.2d 771 (1974), the court said:

"While the Commission need not make 'specific findings of tangible benefit' it must go beyond its bare assertion of benefit. It must provide the basic .facts which lead it to reach its conclusion of public benefit from the decision. If such basic facts have not been developed in the prior agency proceedings and record, then hearings or supplemental inquiry may be necessary.

"Following the Supreme Court in [*F.C.C. v. RCA Communications, Inc.*, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953)] and other decisions, this court has long required that agencies present sufficient support for their conclusions in order that the court can properly review their decision. The court, and the parties, must not be left with *post hoc* rationalizations by counsel as the prime authority for the Commission decision." 498 F.2d at 777–78 (footnotes omitted)

In *F.C.C. v. RCA Communications, Inc.*, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), the Commission had authorized a competitor of RCA to open two new circuits to two European countries. RCA urged that this grant would constitute unnecessary duplicate competition. The Supreme Court (Mr. Justice Frankfurter), although recognizing that "the Commission is not required to make specific findings of tangible benefit" 346 U.S. at 96, 73 S.Ct. at 1005, said that "it is not too much to ask that there be ground for reasonable expectation that competition may have some beneficial effect". 346 U.S. at 97, 73 S.Ct. at 1005. Further, in referring to the Commission's statement that " 'Competition can generally be expected to provide a powerful incentive for the rendition of better service at lower cost' ", said: "Surely one cannot conclude from this bare statement that the Commission, whatever undisclosed awareness it may have of the problem, has sufficiently laid bare its mind to enable us to perform our reviewing function". 346 U.S. at 94–95, n.6, 73 S.Ct. at 1004.

 The fact that the report and order is an "interim" one does not put it in the category of an experimental one so that its effect on the public and whether it is "in the public interest" may be judged in the light of the facts resulting therefrom. For all practical purposes it has all the earmarks of finality since all the parties are directed now to devote their efforts to forcing the public into an all-routed system.

 For these reasons, before the consequences become a *fait accompli*, it would

---

7. Based on RCA's estimate, accepted by the Commission, (JA 75), this amounts to a loss of $428,000 from outbound traffic and $1,600,000 from inbound traffic.

seem wise to ask the Commission to "present sufficient support for their conclusions in order that the court can properly review their decision", *Hawaiian Telephone Company*, 498 F.2d at 777, and "[t]o gather the information [the Commission] need[s] for decision". (JA 28). And since the focal points of the report and order are public interest and the "unresolved questions concerning possible operational, economic and legal implications" (JA 35), it would seem advisable at this time to remand the case to the Commission to enable it to carry out its stated purpose and to indicate "fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry." *Permian Basin Area Rate Cases*, 390 U.S. at 792, 88 S.Ct. at 1373. Such a remand would appear to be not inconsistent with the Commission's views because at the end of its report and order it stated:

> "Meanwhile, we are soliciting prompt comments concerning the operational, economic, and legal implications of an all-routed distribution in order that we may reach an early decision concerning whether the public interest would be served even better through this means." (JA 35).

Since the Commission has ahead of it further fact investigation along lines which would appear to be foundation stones, on which even an interim order should rest, it is not inappropriate for the Commission to develop and state the facts attendant to these vital "implications of an all-routed distribution." When its "early decision" is reached, then and only then can a reviewing court know whether there is solid factual support in the record.

It may very well be that the 1943 formula after the passage of over thirty years should be revised or modified. It may even be possible that the Commission has the power to enlarge by its own *fiat* the share of unrouted messages to which ITT and TRT are entitled. However, any such result should be based upon proof addressed to this subject (and on notice thereof) and

such proof should be reflected in the form of specific findings pertaining thereto which we do not find to be present in the January 7 and September 27, 1976 reports and orders. For these reasons we believe that this proceeding should be remanded to the Commission for further findings which will reflect the basis for the many conclusions stated in the reports and orders, but which we find unsupported by adequate proof. It is also possible that in reconsidering the proper formula for the distribution of international cablegram traffic, the Commission will have the benefit of the additional facilities in aid of such distribution which WU was scheduled to have put in effect by April 1, 1977. (JA 881).

The original balancing scheme of the 1943 formula has as its purpose equalization among the carriers. This equalization may well have become unbalanced over the years, but the solution is to be by a formula "just, reasonable, equitable, *and* in the public interest." (Emphasis supplied). Upon the record before us, public interest seemed to have been ignored except as a phrase used in a conclusory way and not based upon any proof that the public interest will be served by the Commission's new interim plan.

The petition for review is granted, and the Report, Order and Notice of Proposed Rulemaking is vacated. The case is remanded to the Commission for further proceedings in accordance with the above opinion.

FEINBERG, Circuit Judge, concurring:

I join fully in Part I of Judge Moore's opinion and also agree that the FCC's proposed interim formula in this case is not adequately supported by the record before us. See *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953). Therefore, I concur in the decision to remand this case to the FCC for further proceedings.