The NETWORK PROJECT, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

GTE Satellite Corp., RCA Global Communications, Inc.,

and

RCA Alaska Communications, Inc., National Satellite Service Inc., American Satellite Corp., CML Satellite Corp., and Corporation for Public Broadcasting, Intervenors.

No. 73–2050.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1974.

Decided April 18, 1975.

Morton I. Hamburg and Peter Weiss, New York City, of the bar of the Court of New York pro hac vice by special leave of court, for appellant.

Joseph Volpe, III, Counsel, F. C. C., with whom Daniel R. Ohlbaum, Acting Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, F. C. C., were on the brief, for appellee. John W. Pettit, Gen. Counsel, F. C. C., at the time the record was filed and Ashton R. Hardy, Gen. Counsel, F. C. C., also entered appearances for appellee.

Alan Y. Naftalin, Washington, D. C., with whom Herbert D. Miller, Jr., Washington, D. C., was on the brief, for intervenors RCA Global Communications, Inc., and RCA Alaska Communications, Inc.

David A. Irwin, Washington, D. C., was on the brief for intervenor American Satellite Corp.

Joseph M. Kittner, Edward P. Taptich and Norman P. Leventhal, Washington, D. C., entered appearances for intervenor GTE Satellite Corp.

Ben C. Fisher and Grover C. Cooper, Washington, D. C., entered appearances for intervenor National Satellite Services, Inc.

J. Laurent Scharff and W. Theodore Pierson, Jr., Washington, D. C., entered appearances for intervenor CML Satellite Corp.

James L. McHugh, Jr., Washington, D. C., entered an appearance for intervenor Corp. for Public Broadcasting.

Before J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit, and McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

Petitioner, The Network Project, is an unincorporated association devoted to promoting what it considers to be sound principles relating to the regulation or non-regulation of communications systems. It claims standing, unchal-

* Sitting by designation pursuant to Title 28, U.S.Code Section 294(d).

lenged here, as a past and potential user of communications services. Its petition seeks review under 47 U.S.C. § 402(b) of three orders of the Federal Communications Commission granting applications for authority to construct and operate domestic satellite facilities. RCA Global Communications, Inc./RCA Alaska Communications, Inc., 42 FCC 2d 774 (1973); American Satellite Corp., 43 FCC 2d 348 (1973); Hughes Aircraft Co./National Satellite Services, Inc., 43 FCC 2d 1141 (1973).[1]

Petitioner asserts that the Commission failed to consider adequately whether these grants of authority would (1) serve "the public interest, convenience, or necessity," 47 U.S.C. § 307(a), (2) protect adequately First Amendment interests, and (3) permit violations of the antitrust laws or policies of the United States.

We affirm the Commission's orders in the case of RCA and American Satellite. For reasons hereinafter appearing, we defer action on the order granting authority to Hughes/NSS.

## I

The orders under review are one step in a process of development of a domestic satellite system that extends a number of years into the past and that will, by the FCC's own admission, require supervision and further authorization decisions in the future. In 1966, the Commission issued a Notice of Inquiry, 31 Fed.Reg. 3507 (1966), inviting comments on whether it could authorize "non-gov-ernmental entities to construct and operate communications satellite facilities for the purpose of meeting their private or specialized domestic communications requirements," and, if so, whether as a matter of policy it should grant such authorizations.[2] The Commission received responses on both the legal and the policy issues, and also received suggestions as to appropriate satellite systems.

Recognizing that the inquiry had to be broader than first anticipated, the Commission issued a Supplemental Notice of Inquiry, 31 Fed.Reg. 13763 (1966), requesting a description of any plans for providing common carrier services by means of domestic satellite; comments on whether, as a matter of law, there are any restrictions on the Commission's power to authorize common carrier satellite services; and, assuming legal authority, comments on whether as a matter of policy the Commission should grant such authorizations, and, if so, whether to one or to more than one carrier. In response to this Supplemental Notice, the Commission received proposals from the American Broadcasting Company, American Telephone & Telegraph Company, Comsat, and the Ford Foundation; and comments from the General Electric Company.

On March 20, 1970, the Commission issued a First Report and Order. 22 FCC 2d 86 (1970). In light of all of the suggestions and comments,[3] the Commission concluded that (1) it could legally authorize non-governmental entities to construct and operate communications

---

1. Petitioner asserts that it is also seeking review of the Commission's so-called Second Report and Order. Domestic Communications-Satellite Facilities, 35 FCC 2d 844, reconsideration denied, 38 FCC 2d 665 (1972). The Project, whose petition for reconsideration of this order was denied December 22, 1972, did not, however, seek review within the 60 days required by 28 U.S.C. § 2344 and 47 U.S.C. § 402(a). Although we may properly consider the policies adopted in the Second Report and Order in the context of their application in cases reviewed under 47 U.S.C. § 402(b), see Functional Music, Inc. v. F. C. C., 107 U.S.App.D.C. 34, 274 F.2d 543, 546–547, cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1958)), this court presently has before it only three separate petitions to review the three individual authorization orders.

2. Prior to 1966, the nation's experience with communications satellites was on the international level, being derived from the activities of the Communications Satellite Corporation (Comsat) established pursuant to the Communications Satellite Act of 1962, 47 U.S.C. § 701 et seq.

3. These included studies and comments by the executive branch. See 22 FCC 2d at 91–93.

satellites for domestic use, (2) satellites were destined to play an important role in the domestic communications field, and (3) as a matter of policy because considerable leadtime is necessary for implementation of a program, the authorization process should proceed "as promptly as possible, consistent with the public interest. . . ." 22 FCC 2d at 90.

The Commission considered proposals for a number of different systems, *id.* at 90–93, but refused to delineate in advance what type of system or systems should be authorized because it was "unable to determine on the basis of the information. . . before [it], whether domestic communication satellite opportunities would be more fully and effectively developed through one or more multipurpose systems, specialized systems, a combination of both, or through an essentially 'open entry' policy." *Id.* at 93. The Commission rejected the pilot or demonstration program approach because it would be "preferable to permit potential applicants to take the initiative in submitting concrete system proposals for the Commission's consideration," *id.*, and concluded by inviting applications from all parties interested in any type of satellite system. The Commission specifically noted that a grant of authority was dependent on a statutory finding that such grant would be in the "public interest," and warned the parties that the opportunity to file and the making of the expenditures involved in filing "do not in any way indicate that the application will be granted in whole or in part." *Id.* at 94.

In addition to technical qualifications, the applicants were directed to indicate the volume and kinds of services to be provided, and the areas to be served,[4] *id.* at 98; and the public interest considerations supportive of a grant. *Id.* at 100. Specific "public interest" questions were posed by the Commission, including whether a system would be capable of providing service to Hawaii and Alaska; and whether and on what terms facilities would be available (1) to non-commercial, educational networks (including the possibility of funding educational programming from satellite profits), and (2) to meet the data and computer needs of educational institutions. The Commission received eight separate applications for satellite systems, and five entities submitted applications for earth stations.[5]

On March 17, 1972, the Commission issued a Proposed Second Report and Order prepared by the staff, 34 FCC 2d 1 (1972), and requested interested parties to submit comments and to participate in oral argument, with particular emphasis on whether

(a) The Commission should adopt a policy of limited open entry as proposed by the staff or, in the alternative, a policy of unrestricted entry.

(b) The Commission should require Comsat to elect between owning and operating a space segment dedicated to the use of A. T. & T., or owning and operating satellite facilities for the purpose of furnishing services to persons other than A. T. & T.

(c) A. T. & T. should be limited in its use of satellite facilities to the furnishing of its noncompetitive services, *i. e.*, message toll telephone and wide area telephone services.

(d) The Commission as a matter of policy should require licensees of satellite facilities to provide free service to

---

4. The Commission recognized, however, that some plans might have to be extremely tentative. 22 FCC 2d at 99.

5. *System Applicants:* The Western Union Telegraph Co.; Hughes Aircraft Co. and four telephone operating companies of GTE Service Corp.; Western TeleCommunications, Inc.; RCA Global Communications Inc. and RCA Alaska Communications, Inc.; Communications Satellite Corp. and American Telephone and Telegraph Company; Comsat; MCI Lockheed Satellite Corp.; and Fairchild Industries, Inc.

*Earth Station Applicants:* Hawaiian Telephone Co.; Twin County Trans-Video, Inc.; TelePrompTer Corp.; LVO Cable, Inc., and United Video, Inc.; and Phoenix Satellite Corp.

educational entities and, if so, on what basis of eligibility; or whether, as proposed by the staff, the provision of free or reduced rate services to such entities should be left to future rate-making proceedings in accordance with the applicable provisions of the Communications Act or to the initiative of the licensees choosing voluntarily to provide such free or reduced rate service.

34 FCC 2d at 7–8.

Petitioner's involvement in these proceedings first began with an appearance at the oral argument. The only issue there raised by it consisted of an objection to the fact that the Commission was "leaving the ownership and management of a domestic satellite system in the hands of private industry." (Tr. 377, J.A. 311). When asked to suggest an alternative, however, petitioner's representative admitted that he was "not really prepared to make any suggestions to the Commission." (Tr. 386, J.A. 315).

On June 16, 1972, the Commission issued its Second Report and Order, 35 FCC 2d 844 (1972). The Commission summarized its objectives as follows:

(a) to maximize the opportunities for the early acquisition of technical, operational, and marketing data and experience in the use of this technology as a new communications resource for all types of services;

(b) to afford a reasonable opportunity for multiple entities to demonstrate how any operational and economic characteristics peculiar to the satellite technology can be used to provide existing and new specialized services more economically and efficiently than can be done by terrestrial facilities;

(c) to facilitate the efficient development of this new resource by removing or neutralizing existing institutional restraints or inhibitions; and

(d) to retain leeway and flexibility in our policy making with respect to the use of satellite technology for domestic communications so as to make such adjustments therein as future experience and circumstances may dictate.

35 FCC 2d at 846–847.

The Commission elaborated on these objectives and its reasons for them. It determined that an "open entry" policy would best serve the public interest, providing that such entry be subject to certain conditions, set forth in the Second Report. The Commission concluded its Second Report by inviting the several applicants to notify the Commission whether they intended to pursue their pending system applications, in whole or in part, with such modifications as required to meet the conditions imposed by the Report, or whether they desired more time for the purpose of reframing their proposals consistent with the Report.

Six parties, including petitioner, filed petitions for reconsideration or clarification of the Second Report and Order. Petitioner attacked the Commission's multiple-entry policy, arguing that it did not take into account the types of services to be offered, or whether those services would be distributed in a "fair, efficient, and equitable" manner as required by 47 U.S.C. § 307(b). It suggested a non-profit corporation to oversee domestic satellite development and to maintain public control over the use of satellites. It also asserted that certain of the proposals would create violations of the antitrust laws, and that the First Amendment required greater public access to the Hughes CATV distribution system. Finally, petitioner requested the Commission to consider various possible environmental problems that might be associated with a satellite communications system.

The Commission ruled favorably to petitioner on the environmental issue, initiating a separate rule making proceeding to deal specifically with that issue. 38 FCC 2d 665, 703 (1972). As to the question of access by public broadcasting and educational institutions, the Commission stated that "it may well be prema-

ture to expect applicants, several years in advance of their operational date, to have sufficient cost and other information available to set forth their rate proposals with specificity." *Id.* at 700. It therefore reaffirmed its intent to postpone treatment of that issue until rate making proceedings. As to all other aspects of petitioner's request for reconsideration, the Commission said that they "should be appropriately considered in connection with the processing of the applications." *Id.* at 704.

As individual applications were thereafter pursued, petitioner filed petitions to deny applications by American Satellite Corporation (ASC); RCA Global Communications, Inc. (RCA Globcom) and RCA Alaska Communications, Inc. (RCA Alascom); and Hughes Aircraft Company (Hughes), now National Satellite Services (NSS). Each petition to deny raised four objections:

(1) The Commission had failed to fulfill its responsibility to make public interest determinations regarding the types of services to be provided and the communities to be served (citing 47 U.S.C. §§ 307(a) and (b), and 309(a)).

(2) Grant of the applications would violate the Communications Act of 1934 by conferring effective ownership of the public airways on private parties (citing 47 U.S.C. § 301).

(3) Grant of the applications would violate the First Amendment rights of the public in "larger and more effective use of radio," (citing 47 U.S.C. §§ 303(g), 307(a), and 309(a) ).

(4) Grant of each application would constitute a violation of the federal antitrust statutes (and, implicitly, would violate antitrust considerations embodied in the "public interest" criteria of Sections 307(b) and 309(a). *See also* 47 U.S.C. § 314).

Petitioner requested in each case five types of relief, set forth in full in the margin,[6] and also requested a public hearing on the question of whether each application was in accord with the public convenience, interest, or necessity.

II

1. *The Common Carriers.*

■ The authority given to RCA and ASC is for the provision of common carrier services.[7] This circumstance has sig-

---

**6.** RELIEF REQUESTED

17. For the foregoing reasons, the Project petitions the Commission either to deny the . . . application or to grant them subject to the following conditions:

(a) That [the applicant] be required to provide as many satellite earth station channels as are needed for free and unrestricted public use;

(b) That [the applicant] be required to provide as many transponders as are needed for free and unrestricted public use;

(c) That, in the case of television and CATV transmission, the programming of said public satellite transponders and earth station channels be guaranteed reception by all television viewers and cable subscribers serviced by the . . . system;

(d) That said public earth station channels and satellite transponders be financed as sufficiently as is necessary from the revenues generated by the commercial services offered by [the applicant]. Costs for maintenance of both the satellite and earth station facilities should be borne by [the applicant]. In addition to costs of maintenance, [the applicant] should be required to contribute fifty percent (50%) of the revenues generated by the oper-

ation of its commercial services toward the cost of the public's use of said public channels, including the cost of program production for television and CATV users;

(e) That access to said public channels be determined in accord with the numbers of signatures of the general public accompanying a particular proposal for usage—the more signatures, the more transponder and channel time, with a fixed outside limit on the duration of a single transmission to prevent abuse—or by some other method of access reasonably calculated to serve the public interest; that [the applicant] designate an individual or individuals to receive and process citizen signatures submitted for access to its facilities for use of said public channels; and that this individual or individuals distribute programming funds to authorized users in accordance with the said signature access procedure, or by some other method reasonably calculated to serve the public interest.

**7.** In their respective immediate applications, both RCA and ASC propose to lease transponder capacity from Telsat Canada. RCA proposes earth stations near New York, Los Angeles, San Francisco, Juneau, and Anchor-

nificance for the various objections raised by petitioner.[8]

It is said that the Commission failed in its duty to examine whether the grants would be in the "public interest, convenience, and necessity" as required by 47 U.S.C. §§ 307(b) and 309(a). In Hawaiian Telephone Company v. F.C.C., 162 U.S.App.D.C. 229, 498 F.2d 771 (1974), we recently spoke of the process that the FCC must follow in making this determination in the case of a common carrier:

> When the FCC considers an application for certification of a new line, it must start from the situation as it then exists, and must apply the statutory standard to determine whether indeed the public convenience and necessity requires more or better service. If it determines that more or additional competitive service would be in the public interest, then it can consider how much added service is necessary, and finally to whom the opportunity for providing service should be awarded. In this latter determination the Commission can balance equities and opportunities among the various carriers. The initial question for the Commission, however, must be whether the public interest requires more or different service.

*Id.* at 776. *See also* F.C.C. v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); Washington Utilities & Transportation Commission v. F.C.C. No. 71–2919, 513 F.2d 1142 (9th Cir. Jan. 20, 1975); Bell Tel. Co. of Penn. v. F.C.C., 503 F.2d 1250, 1270–73 (3d Cir. 1974); Specialized Common Carrier Services, 29 FCC 2d 870, 902–03 (1971); Proposed Second Report and Order, 34 FCC 2d at 36–37.

As the Commission recognized, the basic touchstone for the public interest decision is "the Commission's mandate to regulate 'interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide, and world-wide wire and radio communications service with adequate facilities at reasonable charges * * *' (Section 1) and 'generally encourage the larger and more effective use of radio in the public interest' (Section 303(g))." Proposed Second Report and Order, 34 FCC 2d at 36. Phrased differently, the Commission must determine whether the service proposed will be beneficial to the community to be served, and which among competing applicants will best provide that service. The Commission should consider whether the new service will create a net benefit to the communications system as a whole, and whether its immediate or future interaction with existing and anticipated systems will be beneficial or detrimental, *see* F. C. C. v. RCA Communications, Inc., *supra,* 346 U.S. at 93 n. 3, 73 S.Ct. 998; Washington Utilities & Transportation Commission v. F.C.C., *supra,* 513 F.2d at 1155–1160; Bell Telephone Co. of Penn. v. F.C.C., *supra.* We note that the nature of a common carrier necessarily requires a different, and often more generalized, analysis than that outlined in the Primer on Ascertainment of Community Problems by Broadcast Applicants, 27 FCC 2d 650 (1971).[9]

Here the Commission initially determined that the development of satellite services has "the potential of making significant contributions to the nation's

8. Since any violation of the First Amendment or the antitrust laws would constitute a violation of the standards of Sections 307(b) and 309(a), we will treat all of the Project's objections under the general rubric of "public interest."

9. Indeed, the Primer itself recognizes that it is not applicable to common carriers, *see* 27 FCC 2d at 682.

age. ASC proposes earth stations in New York, Chicago, Dallas, and Los Angeles. The specific common carrier services to be provided are described at 42 FCC 2d 774, 775 (RCA) and 43 FCC 2d 348, 349 (ASC) with, in each case, the possibility that further services that appear feasible and desirable will be added. Both RCA and ASC have plans, subject to Commission approval, to launch and operate satellites to increase and improve the services proposed in the instant applications.

domestic communications structure by providing a better means of serving certain of the existing markets and developing new markets not now being served." Second Report and Order, 35 FCC 2d at 845. Petitioner does not contest this finding.

■ The Commission further adopted (at 35 FCC 2d 850) the staff's conclusion that the public interest would best be served by:

(a) Early authorization of some domestic satellite facilities.

(b) Avoidance of comparative hearings or other protracted further proceedings at this stage.

(c) Open entry to all pending applicants (except those, if any, found to be disqualified on policy grounds), generally conditioned so as to maintain flexibility to authorize new technology, new usages, and new applicants; and with such special conditions as are deemed necessary and appropriate in the public interest.

34 FCC 2d at 31 [footnote omitted].

. The Commission recognized that the exact contours of the benefits provided were not ascertainable until after evaluation of the initial functioning of the proposed systems. 35 FCC 2d at 844–47. The authorizations are, in effect, for experimental systems in accord with the Commission's duty to "[S]tudy new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest." 47 U.S.C. § 303(g). See also Connecticut Committee Against Pay T.V. v. F. C. C., 112 U.S.App.D.C. 248, 301 F.2d 835 (1962).

Having determined that such systems will generally be in the public interest (or at least present such potential as to make their preliminary authorization desirable) the Commission was faced with the question whether the particular applications would serve this general goal.

The Commission partially resolved this question in its determination that multiple entry would provide the greatest total benefit and the most informational input for further evaluation. The Commission was most emphatic, however, in its assertion that:

Our decision in favor of multiple entry does not mean that we have opted for a policy of "unlimited or unrestricted open entry." Our aim, as outlined above, is to afford qualified applicants a reasonable opportunity to demonstrate the public advantages in use of the satellite technology as a means of communications. But such entry cannot be "open" in the sense that it is without any restrictions or limitations. Pursuant to statute we must require showings of financial technical and other qualification and make the requisite finding that a grant of the particular proposal will serve the public interest, convenience, and necessity.

Second Report and Order, 35 FCC 2d at 850–51.

This public interest finding revolves around the questions of what locations will be served, what the service will consist of, and whether the proposed system is in some way deficient to the detriment of the public, or forecloses alternative systems that would be more beneficial.

■ The Commission was clearly correct, and petitioner does not assert otherwise, in concluding that the services explicitly outlined in the applications are in the public interest and that the systems are without technical deficiencies. Indeed, the Commission went beyond this finding and considered possible future needs for service:

ASC proposes to offer a broad spectrum of communications services and there is no indication that it would decline to provide any type of service desired by the public or that it would refuse to serve any area of the country desiring service once its proposed

Phase II system is operational. . . In any event ASC as a common carrier will have statutory responsibility to provide service upon reasonable demand (See Section 201 of the Communications Act) and we have ample authority under Section 214(e) [sic] to require it to provide service. With respect to the request for a requirement for the provision of "public channels" without charge, we stated in Docket No. 16,495 that we would consider rate making for service to educational entities at free or reduced charges when the domestic satellite systems become operational; however, it is "premature to expect applicants, several years in advance of their operational date, to have sufficient cost and other information available to set forth their rate proposals with specificity." *See* Memorandum Opinion and Order in Docket No. 16,495 December 22, 1972, 38 FCC 2d 665, 700.

43 FCC 2d 348, 355–56 (1973). [The above discussion was specifically made applicable to RCA in the grant of that application. 42 FCC 2d 774, 778 (1973).]

■■ Petitioner contends, however, that the Commission in some way abridged the First Amendment rights of potential listeners or speakers by failing to assure access of all points of view to the carriers' lines.[10] It cites no cases, and we know of none, applying the doctrine of Red Lion Broadcasting Co., Inc. v. F. C. C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), to common carriers. *See generally* National Association of Theatre Owners v. F. C. C., 136 U.S.App. D.C. 352, 420 F.2d 194, 206 (1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970). We need not, however, pursue that question, for the Commission recognized the desirability of, and the national policy favoring, special access terms for public broadcasting and other educational interests, *see* Second Report and Order, 35 FCC 2d at 856. The Commission has signified its purpose to take account of this policy in its promulgation of tariffs, and we have been given no cogent reason to believe that either its good faith or ability to carry out that purpose is lacking.[11] The Commission's approach therefore appears to us both reasonable and acceptable under the statute and the Constitution.

■ After finding that the services and market served are in the public interest, the Commission was faced with the question of whether some collateral effect of the grants would place them at odds with the public interest. In this category is the spectre of restraints upon competition. Antitrust violations in this situation may be of two kinds. The first, arising from the licensee's also being a purchaser of the services, concerns the possibility of domination of the market through cross-subsidization.[12] Petitioner does not, however, appear to raise such a claim. The second possible antitrust violation centers on the connection between the equipment supplier and the supplier of services, a form of vertical integration.

In considering this latter question, the Commission noted the Department of Justice's comment:

[Vertical integration] bypasses restrictions imposed by operators whose satellite specifications are tied to a differ-

10. Petitioner cannot be arguing that discrimination will occur between those able to pay reasonable rates, for, as the Commission recognizes, a common carrier has a statutory responsibility to provide service upon reasonable demand. 47 U.S.C. § 201.

11. Petitioner argues that the operators of the satellites will be able to claim that, given their massive investments, they should not be required to forego any of their profits (especially if those profits turn out to be marginal) for public access. We note, however, that the applicants have entered into these ventures knowing both that they are speculative and that public access is likely to be required. *See* 35 FCC 2d at 849–50, 859. We are therefore confident that the Commission will not be overawed by any protestations of surprise or difficulty in regard to Commission requirements of special tariff treatment for public broadcasting or educational programming.

12. Indeed, this problem was perhaps foremost in the Commission's mind, especially with respect to the A. T. & T. and Comsat applications. *See, e. g.,* 35 FCC 2d at 847–49.

ent technology, and allows suppliers—at their risk—to test the technology which they are promoting. Forward integration in these circumstances does increase the barriers to entry for competing suppliers, but at this early stage of development, it may be the only way to encourage the development of rival technologies.

[As quoted in Proposed Second Report and Order, 34 FCC 2d at 44]. On the basis of this comment and its own evaluations, the Commission concluded:

[A]lmost a year was afforded for the submission of applications and these are the only system applicants who came forth. They have demonstrated an immediate, concrete interest in the field and they are the sole entities now available for early authorization. Moreover, each has some background or experience of a nature that might make a useful contribution toward the activation of this new, and somewhat risky, domestic technology and the expeditious realization of its potential benefits for the public. Indeed, it seems dubious whether an applicant which lacked any experience in terrestrial or satellite communications or in building communications satellites or any stake as a user, would possess the practical know-how needed to bring this sophisticated communications medium into being for domestic use in a prompt, effective and efficient manner.

\* \* \* \* \* \*

Under present circumstances, we think that the public interest would be better served by encouraging entry by different equipment manufacturers to demonstrate rival technologies, rather than barring equipment suppliers across-the-board or Hughes alone. As the Department of Justice notes, if Hughes should abuse entry by discriminating against Comsat, the Commission could take remedial action. Moreover, we will condition any authorization to an equipment supplier upon the existence or creation of a separate corporate entity to engage in the communications satellite service aspect.

*Id.* at 43–45. [Adopted by the Second Report and Order, 35 FCC 2d at 851, 854].

The Commission thus provided that any authorization to an equipment supplier be contingent on "the existence or creation of a separate corporate entity to engage in the satellite operations." 35 FCC 2d at 855. It further made clear that it would closely monitor rates. *Id.* at 854–55. We need not speculate whether the arrangement will in fact some day so operate as to create antitrust problems. It is enough that the proposals are not *per se* a violation, *see* United States v. Paramount Pictures, Inc., 334 U.S. 131, 173–74, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), and that the Commission reasonably concluded that a violation would not occur. Indeed, the Commission found that competition would be enhanced.

 Petitioner asserts that an evidentiary hearing is necessary to a finding that the grants will be in the public interest. *See* 47 U.S.C. § 309. As this court has held, *see, e. g.,* Stone v. F.C.C., 151 U.S.App.D.C. 145, 466 F.2d 316 (1972), a hearing is not necessary where the Commission's decision is based on inferences and conclusions drawn from undisputed facts. Petitioner does not dispute any of the material facts on which the Commission's conclusions rest, but asserts only that insufficient facts were adduced to make a public interest finding. In so asserting, it essentially attempts to impose the standards of the Primer on Ascertainment, 22 FCC 2d 650 (1971), on common carriers. As noted above, this is not correct. The Commission was faced with a situation in which it determined that the new and increased services would be beneficial but, unlike the usual common carrier case, was unable to define with assurance the precise scope or content of all aspects of the proposals. In this unique and experimental situation, we believe that the Commission rationally determined, on the basis of all necessary factual investigation, that the grant of the applications, subject—as the Commission recog-

nizes—to continuing supervision and evaluation, is in the public interest.[13]

## 2. The NSS Application.

The NSS application sought authorization for two twelve-transponder satellites. GTE Satellite Corp. (GSAT) had agreed (and received authorization in the same proceeding) to lease ten of the transponders in the first satellite, plus back-up rights in ten transponders in the second satellite. NSS was to receive from this lease for seven years an annual rental of $900,000 per transponder. The remaining two transponders on the first satellite were promised by NSS to the Public Broadcasting Corp., without charge, with back-up rights to two transponders on the second satellite. NSS proposed to use the back-up capacity of the second satellite for distribution of cable television (CATV) programming to cable distributors.

The Commission recognized that the NSS service will not be in the common carrier mode. 43 FCC 2d 1141, 1158–59 (1973). And it is clear from the proposal that NSS's interest in implementing its grant is dependent on participation of GSAT, or the existence and Commission approval of an equivalent substitute.

At oral argument the Commission represented that a proceeding before it was in process that might conceivably culminate in GTE's being authorized to enter into an agreement with another company, which GTE apparently has come to prefer over the NSS arrangements. In response to our written inquiry to the parties following oral argument, the Commission forwarded to us the following letter from NSS received by the Commission:

> This is written on behalf of our client, National Satellite Services, Inc. (NSS) and is in response to your inquiry as to the status of the NSS construction permit for three Domestic Fixed Satellite Space stations, 5–DSS–P(3)–71. As you are aware, the NSS proposal contemplated the providing of leased satellite capacity to GTE Satellite Corporation. Subsequent to receiving the necessary construction permits for the joint NSS/GTE endeavor, GTE filed applications with the Commission to modify its authorization proposing instead a joint system in conjunction with AT&T. On September 25, 1974, the Commission designated these GTE applications for hearing, stating that substantial questions were raised which prevented it from making a finding that the public interest would be served by approval of the proposal.

> This change in plans by GTE and the present unsettled state of things, in connection with their proposal, has for the time being prevented NSS from proceeding further. NSS does however have much of the necessary hardware to proceed and is willing to renegotiate with GTE should events make such action possible and desirable. For the present, however, NSS has elected to maintain the status quo awaiting further FCC action which may clarify the matter.

Letter from Grover Cooper to Joseph Volpe, Dec. 4, 1974.

The Commission has informed us that the hearing on the GTE–AT&T proposal has been held and the record closed on January 8, 1975. It appears to us that, under these circumstances, it is appropriate to defer decision on the NSS application until the question of GTE's participation is resolved.

Accordingly, the orders in 42 FCC 2d 774, and 43 FCC 2d 348 are affirmed. The issues raised in the petition to review 43 FCC 2d 1141 are reserved pending a decision by NSS whether that authorization will be pursued.

It is so ordered.

---

**13.** We note that the Commission acted reasonably in taking cognizance of the fact that, in these special circumstances, considerable lead time is required for preparation of a system, and in determining that the public interest required avoidance of any unnecessary delay. See 34 FCC 2d 31–32, 35 FCC 2d 850.