224 F.3d 768 (D.C. Cir. 2000)
 GTE Service Corporation andMicronesian Telecommunications Corporation,Petitioners
v.
Federal Communications Commission andUnited States of America,Respondents
MCI Communications Corporation, et al.,Intervenors
 No. 97-1538 ,99-1045, 99-1046
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued April 4, 2000
Decided July 14, 2000
 
 On Petitions for Review of an Order of the Federal Communications Commission
 Daniel E. Troy and Howard J. Symons argued the cause for petitioners. With them on the briefs were Gail L. Polivy, R. Michael Senkowski, Michael F. Altschul, Michelle M. Mundt. David A. Gross, James D. Ellis, Robert M. Lynch, Michael J. Zpevak, William B. Barfield, M. Robert Sutherland, L. Andrew Tollin, Michael Deuel Sullivan, Luisa L. Lancetti, S. Mark Tuller an Matthew B. Pachman. M. Edward Whelan and Theodore C. White house entered appearances.
 John Edward Ingle, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Christopher J. Wright, General Counsel, Laurel R. Bergold, Counsel, Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson, and Robert J. Wiggers, Attorneys. Adam D. Hirsh, Attorney, entered an appearance.
 John W. Katz, Veronica M. Ahern, Herbert E. Marks and Thomas K. Crowe were on the brief for intervenors.
 Before: Williams, Ginsburg, and Sentelle, Circuit Judges.
 Opinion for the Court by Circuit Judge Ginsburg.
 Ginsburg, Circuit Judge:
 
 
 1
 Several parties petition for review of four orders by the Federal Communications Commission implementing the rate integration requirement of § 254(g) of the Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 254(g). The petitioners challenge two determinations made by the Commission: (1) That a telecommunications provider is required to integrate its rates across all commonly owned or controlled affiliates that provide interstate interexchange services; and (2) that the requirement of rate integration applies to providers of Commercial Mobile Radio Service (CMRS), that is, wireless technologies such as cellular and PCS.
 
 
 2
 We hold first that the Commission's interpretation of § 254(g) as requiring rate integration across affiliates is reasonable and second that the Commission erred in concluding the plain text of § 254(g) required it to apply the rate integration requirement to providers of CMRS. We therefore vacate the order in relevant part and remand this matter to the Commission for further consideration whether, as an exercise of its delegated authority, § 254(g) should be applied to providers of CMRS.
 
 I. Background
 
 3
 Prior to 1972 rates for interstate long distance telecommunications services to and from non-contiguous domestic locations such as Alaska, Hawaii, and Puerto Rico were much higher than rates for the same services within the contiguous 48 states. In effect, providers of long distance services treated those locations as foreign for the purpose of setting long distance rates. See Establishment of Domestic Communications-Satellite Facilities by Non-Governmental Entities, 35 F.C.C.2d 844, 856 p 35 (1972) (Domsat II Order).The Commission became concerned that this disparate treatment "inhibited the free flow of communications between the contiguous states and [non-contiguous domestic] points to the disadvantage of all of our citizens." Id. The Commission also recognized that the use of satellites, the cost of which is insensitive to distance, was making it economically feasible to serve non-contiguous locations at rates comparable to those offered in the contiguous 48 states. See id.
 
 
 4
 In 1972, therefore, the Commission initiated a policy of "rate integration": Telecommunications carriers serving Alaska, Hawaii, and Puerto Rico (and later the U.S. Virgin Islands) were required, as a condition of their licenses to use new domestic satellites, to submit a plan that would "give maximum effect to the elimination of overall distance as a major cost factor and ... integrate these three United States points into the uniform mileage rate pattern that now obtains for the contiguous states." Id. at 857 p 37. Thus AT&T was required to develop a tariff that would integrate the rates it charged for interstate long distance service to Alaska, Hawaii, and Puerto Rico into the domestic rate pattern applicable in the contiguous 48 states. See Integration of Rates, 61 F.C.C.2d 380, 392 (1976) (1976 Rate Integration Order).Rate integration would thus ensure "service between the contiguous states and ... noncontiguous points[ ] at rates that are equivalent to those prevailing for comparable distances in the contiguous 48 states." Integration of Rates, 9 F.C.C.R. 2197, 2198 n.2 (1993).
 
 
 5
 A. Rate Integration under the Telecommunications Actof 1996
 
 
 6
 The Commission adopted its policy of rate integration as an exercise of its broad authority under the Communications Act to regulate carriers for the public convenience and necessity. See 47 U.S.C. § 214; Domsat II Order, 35 F.C.C.2d at 856 p 35. In the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), the Congress put rate integration upon a statutory footing by adding § 254(g) to the Communications Act of 1934:
 
 
 7
 Within 6 months after February 8, 1996, the Commissionshall adopt rules to require ... that a provider ofinterstate interexchange telecommunications servicesshall provide such services to its subscribers in eachState at rates no higher than the rates charged to itssubscribers in any other State.
 
 
 8
 Although perhaps not obvious on its face, the parties agree that § 254(g) means what the Conference Report says it means:
 
 
 9
 New section 254(g) is intended to incorporate the polic[y]of ... rate integration of interexchange services....The conferees intend the Commission's rules ... toincorporate the policies contained in the Commission'sproceeding entitled "Integration of Rates and Servicesfor the Provision of Communications by Authorized Com-mon Carriers between the United States Mainland andthe Offshore Points of Hawaii, Alaska and PuertoRico/Virgin Islands" (61 FCC2d 380 (1976)).H.R. Conf. Rep. No. 104-458, at 132 (1996).
 
 B. The Commission's Orders
 
 10
 The Commission promulgated rules requiring rate integration under § 254(g) in a series of four orders: (1) Imple-mentation of Section 254(g) of the Communications Act of 1934, as Amended, Report & Order, 11 F.C.C.R. 9564 (1996) (Integration Order); (2) First Memorandum Opinion and Order on Reconsideration, 12 F.C.C.R. 11812 (1997) (First Reconsideration Order); (3) Order, 12 F.C.C.R. 15739 (1997) (Stay Order); and (4) Memorandum Opinion & Order, 14 F.C.C.R. 391 (1998) (Second Reconsideration Order). The petitioners now challenge two determinations made in the course of those orders.
 
 1.Rate Integration Across Affiliates
 
 11
 In the Integration Order the Commission announced without elaboration that it read the term "provider of interstate interexchange telecommunications services" in § 254(g) to include "parent companies that, through affiliates, provide service in more than one state." 11 F.C.C.R. at 9598 p 69.Upon reconsideration at the instance of GTE and U.S. West, Inc., the Commission explained that the statute was ambiguous on the specific issue whether for purposes of rate integration a "provider of interstate interexchange telecommunications services" includes commonly owned or controlled affiliates of the provider. First Reconsideration Order, 12 F.C.C.R. at 11819 p 14. Because an interexchange carrier could circumvent rate integration by providing interstate long distance service to each non-contiguous location through a separate subsidiary, the Commission concluded that requiring rate integration among affiliates was most consonant with the purpose of the statute. See id. p 15.Under the resulting rule, for example, the GTE affiliate that provides long distance service only in the Commonwealth of the Northern Mariana Islands is required to integrate its rates with those of all other GTE affiliates providing long distance service anywhere in the contiguous 48 states or in other non-contiguous domestic locations.
 
 2.Rate Integration by CMRS Providers
 
 12
 Prior to enactment of the 1996 Telecommunications Act, the Commission had required only wireline carriers, and not providers of CMRS, to integrate their rates. In the Integration Order the agency gave no indication that it believed § 254(g) either required or authorized a change in this state of affairs. In the First Reconsideration Order, however, the Commission stated, again without elaborating, that CMRS providers were required by § 254(g) to integrate the rates for their interstate interexchange services. 12 F.C.C.R. at 11821 p 18. Several parties petitioned the Commission to reconsider and stay enforcement of that determination.* In the Second Reconsideration Order the Commission explained its rationale for requiring CMRS providers to integrate their rates: Section 254(g) by its terms applies to providers of interstate interexchange service without making an exception for CMRS. 14 F.C.C.R. at 396 p 10.
 
 
 13
 Because CMRS does not use wireline exchanges, its coverage by § 254(g) raised the following question for the Commission: Which interstate CMRS are "interexchange" services? Noting that the Communications Act defines "telephone exchange service" as "service within a telephone exchange, or ... comparable service provided through a system of switches, transmission equipment, or other facilities," 47 U.S.C. § 153(47), the Commission determined that CMRS within a "major trading area" (MTA) was "comparable" to wireline "service within a telephone exchange," 14 F.C.C.R. at 401 p 23; therefore, CMRS between MTAs was comparable to "interexchange" wireline service, and interstate, inter-MTA CMRS was subject to rate integration.
 
 II. Analysis
 
 14
 The petitioners seek review of the rules requiring rate integration among affiliates and the application of rate integration to providers of CMRS. Both challenges turn upon the Commission's interpretation of the phrase "provider of interstate interexchange telecommunications services" in § 254(g). Because the Congress committed administration of the Communications Act to the Commission, we review the petitioners' challenges to the Commission's interpretation of § 254(g) using the two-step analysis of Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984). Under Chevron step one, we ask "whether Congress has directly spoken to the precise question at issue." If so, then we "must give effect to the unambiguously expressed intent of Congress." If not, then under Chevron step two we will defer to the agency's interpretation of the Act if it is reasonable in light of the text, the structure, and the purpose of the Act. See id. at 842-43.
 
 A. Rate Integration Across Affiliates
 
 15
 The petitioners make two arguments for the proposition that the Congress in § 254(g) unambiguously directed the Commission to prescribe rate integration only with respect to each individual provider of telecommunications services and not with respect to all commonly owned or controlled affiliates. They first argue that because "provider" means simply "one that provides," the Congress could not have meant the phrase "provider of interstate interexchange telecommunications services" to include parent companies, which are not licensed to and do not provide telecommunications services.Further, because holding companies are not "providers," they "may not be used as conduits through which rate integration requirements are imposed on commonly owned affiliates."
 
 
 16
 Both parts of petitioners' argument miss the mark. First, the Commission no longer interprets "provider of interstate interexchange telecommunications services" to include parent companies that are not themselves carriers: In the First Reconsideration Order the Commission, responding to this very argument, narrowed its cross-affiliate rule to apply only to "affiliated carriers"--thereby excluding any parent company that is not itself a carrier. 12 F.C.C.R. at 11819 p 16.And as to the petitioners' derivative claim that the Commission cannot regulate commonly owned affiliates except by impermissibly regulating parent companies as "conduits," the petitioners provide no legal support for this ipse dixit. Nor does the Commission either purport or need to regulate the parent--as a conduit or otherwise--when it requires two or more carriers under common control to coordinate their activities.
 
 
 17
 The petitioners' second argument turns upon the Congress having expressly extended regulatory obligations to the "affiliates" of a carrier in other sections of the Act; by not similarly including the word "affiliates" in § 254(g), we are told, the Congress unambiguously (albeit implicitly) limited the scope of the integration requirement to the rates charged by individual providers of telecommunications services. The petitioners make a substantial point: In 1996 the Congress added "affiliate" as a defined term in the Communications Act, see 47 U.S.C. § 153(1), and then used that term in 15 sections of the Act, see 47 U.S.C. §§ 222, 224, 228, 251, 260, 271-275, 541, 543, 548, 572, and 573. In many of those sections the Congress specifically extended a regulatory prohibition or obligation from the individual carrier to the carrier's affiliates. See, e.g., 47 U.S.C. § 572 ("No local exchange carrier or any affiliate of such carrier ... [may acquire] more than a 10 percent financial interest, or any management interest, in any cable operator providing cable service within the [LEC's] telephone service area").
 
 
 18
 If the Congress had written § 254(g) upon a blank slate, announcing an entirely new requirement that rates to noncontiguous points be integrated, then the absence of "affiliates" from the text of § 254(g), coupled with its inclusion in so many other sections, might be strong textual evidence that the Congress spoke directly to this issue. See, e.g., Alabama Power Co. v. FERC, 160 F.3d 7, 14 (D.C. Cir. 1998). Section 254(g) does not, however, announce a new policy; the legislative history makes clear that the Congress intended § 254(g) to carry forward by regulation the Commission's preexisting policy requiring rate integration. See H.R. Conf. Rep. No. 104-458, at 132 (1996). An undisputed aspect of that policy is that AT & T was required to integrate its rates across all its affiliated providers. The parties dispute whether other carriers were required to integrate rates across affiliates but, regardless of the answer to that question, it is clear that the Commission under its preexisting policy could and in the case of AT&T did mandate integration across affiliates. Against that backdrop, the omission of the word "affiliates" in a statute intended to perpetuate existing Commission policy cannot be read to preclude for the first time integration across affiliates; the most the omission tells us is that the Congress did not specifically require the Commission to order rate integration across affiliates. We agree with the Commission, therefore, that § 254(g) is ambiguous on the precise issue whether affiliates may be included within the phrase "provider of interstate interexchange telecommunications services."
 
 
 19
 Turning to Chevron step two, the petitioners argue that the Commission's interpretation is unreasonable because it conflicts with two of the purposes of the 1996 Act, namely, "to promote competition and reduce regulation." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996) (preamble), and with one of the goals of rate integration, namely, the expansion of telecommunications services offered to non-contiguous domestic locations, see Domsat II Order, 35 F.C.C.2d at 856 p 35. The petitioners illustrate their point with the following (not very) hypothetical situation: A carrier provides interstate interexchange service through separate affiliates in the highly competitive mainland market and in a high-cost domestic overseas market (such as Guam, which cannot be served by domestic satellites because of its distance from the continental United States). If rates must be integrated across those affiliates then, according to the petitioners, the carrier must either charge above-market rates on the mainland, and therefore become noncompetitive, or charge below-market rates in the overseas location, and therefore lose money on every call.Faced with this Hobson's choice, the carrier will want to sell its overseas affiliate, presumably to a new owner with no other operations subject to the rate integration requirement.
 
 
 20
 The problem with the petitioners' argument--passing over the Commission's factual rejoinder that the carrier would not lose money on every call--is that the central purpose of rate integration, namely, ensuring "service between the contiguous states and ... noncontiguous points[ ] at rates that are equivalent to those prevailing for comparable distances in the contiguous 48 states," Integration of Rates, 9 F.C.C.R. 2197, 2198 n.2 (1993), by its nature does nothing to reduce regulation or to promote competition. The real question raised by this argument, therefore, is not whether integration across affiliates is regulatory and anti-competitive but whether it is unreasonable in light of the underlying goal of rate integration (pace the preamble to the 1996 Act), namely, equalized rates to non-contiguous locations. Viewed thus at the margin, the petitioners' hypothetical scenario actually demonstrates the reasonableness of the Commission's interpretation: If the Commission did not read affiliates into the term "provider" in § 254(g), then the petitioners' hypothetical carrier would charge higher rates in the non-contiguous market (through one affiliate) than it charges on the mainland (through the other affiliate), and there would be no rate integration of non-contiguous markets at all. We therefore agree with the Commission that interpreting "provider of interstate interexchange telecommunications services" to encompass commonly owned or controlled affiliates is reasonable in light of the text and the regulatory purpose of § 254(g).
 
 
 21
 Finally, the petitioners challenge the Commission's decision as inconsistent and therefore arbitrary and capricious. Even if interpreting "provider" to include affiliates is permissible, the petitioners claim, the Commission has interpreted "provider" in three inconsistent ways: (1) for wireline carriers, "provider" means a provider and all commonly owned or controlled affiliates; (2) for providers of CMRS, as towhich the Commission has stayed the requirement of affiliate integration, "provider" will likely be interpreted to mean a provider and all affiliates not jointly owned by competing providers; and (3) for the purpose of "geographic rate averaging"-another policy prescribed in § 254(g)--the Commission has "implicitly" excluded affiliates from the scope of the term "provider."
 
 
 22
 We reject this challenge for two reasons. First, as the Commission notes, it has to date given but a single interpretation to the term "provider" in § 254(g). For the purpose of rate integration, "provider" includes affiliates of both wireline and CMRS providers; the Stay Order did not alter this interpretation, and the Commission may yet adhere to it.And in a separate order not under review here, the Commission gave the same interpretation for the purpose of geographic rate averaging. See Motion of AT&T Corp. to be Reclassified as a Non-Dominant Carrier, 12 F.C.C.R. 20787, 20804 p 31 (1997). Second, even if the Commission ultimately does interpret "provider" differently with respect to wireline service and CMRS, that would not necessarily be arbitrary and capricious. The Commission might reasonably conclude that requiring integration among affiliates better advances the purposes of the Congress with respect to wireline service than it does with respect to CMRS, depending upon the competitive structure of the markets in which the two services are offered. On the record presently before us, therefore, we see no infirmity in the Commission's actions, and we deny the petition to review the requirement of integration across affiliates.
 
 B. Rate Integration by CMRS Providers
 
 23
 The Commission held that the phrase "provider of interstate interexchange telecommunications services" in § 254(g) "unambiguously applies to the interstate, interexchange services offered by CMRS providers. If Congress had intended to exempt CMRS providers, it presumably would have done so expressly as it did in other sections of the Act." Second Reconsideration Order, 14 F.C.C.R. at 396 p 10. In an unusually direct confrontation under Chevron step one, the petitioners maintain not that the statute is ambiguous but that it unambiguously means the opposite of what the Commission says it means. For our part, we cannot agree with either the Commission or the petitioners that the Congress spoke unambiguously on the precise issue that divides them.
 
 
 24
 The Commission's secondary assertion that the Congress would have expressly exempted CMRS from § 254(g) had it so intended is undermined by the Conference Report indicating that the Congress meant § 254(g) to incorporate the Commission's preexisting rate integration policy, see H.R. Conf. Rep. No. 104-458, at 132 (1996), which the Commission had never before applied to CMRS. As Commissioner Powell wrote in dissent, "when it is undisputed that CMRS providers were not subject to the Commission's pre-1996 Act rate integration policy, and where Congress seems to say it is merely incorporating that policy, why would we expect to find an explicit and unambiguous indication to exclude them? "Dissenting Statement of Commissioner Michael K. Powell, 1999 WL 38420 (Jan. 28, 1999).
 
 
 25
 This leaves the Commission's primary assertion that the term "interexchange telecommunications service," which is not defined in the Communications Act, "on its face unambiguously" makes CMRS subject to rate integration under § 254(g). The Commission starts out in the hole: Because CMRS does not use exchanges, it is by no means obvious that the Congress, when it used a phrase in which the word "interexchange" is an essential term, was referring to CMRS.True, the Congress provided a functional definition of "telephone exchange service," including not just "service within a telephone exchange" but also "comparable service provided through ... other facilities," 47 U.S.C. § 153(47); therefore, the Commission may characterizeas "exchange service" even services that, like CMRS, do not use exchanges. That the Congress may have extended to providers of CMRS various statutory obligations attaching to "exchange service" does not, however, demonstrate that the Congress, in using the word "interexchange," must have extended the requirement of rate integration to providers of CMRS. The Commission might decide, as an exercise of its delegated authority to interpret ambiguities in the Act, that the phrase "interexchange telecommunications service" in § 254(g) is best read in a manner analogous to the express definition of "exchange service," that is, as applying not only to wireline interexchange service but also to CMRS that the Commission determines is "comparable"; but that interpretation is certainly not compelled by the "unambiguous" text of the statute.
 
 
 26
 As for the petitioners' Chevron step one arguments, they first claim that the Congress's use of the word "interexchange"--which they say has no relevance to CMRS--demonstrates that § 254(g) must apply only to wireline providers. As we just explained, however, the functional definition of "telephone exchange service" in 47 U.S.C. § 153(47) demonstrates that the Congress has authorized the Commission to characterize as "exchange service" even services that do not use exchanges. Therefore it is not clear that the Congress was referring only to wireline service when it used the word "interexchange." The petitioners' second claim is that by stating in the legislative history that § 254(g) was intended to codify the Commission's preexisting policy, which did not apply to providers of CMRS, the Congress clearly and unambiguously excluded providers of CMRS from the coverage of § 254(g). We think this reads too much into both the Commission's policy and the legislative history. The Commission had never either applied or declined to apply the policy to providers of CMRS. There is no reason to believe that prior to the 1996 Act the Commission was in any way precluded from extending its policy to providers of CMRS, and the Congress, in stating that it was incorporating the Commission's preexisting policy into § 254(g), gave no indication that it meant to freeze rate integration as it then was and to prohibit any further development or extension of the policy.
 
 
 27
 The petitioners further argue that application of § 254(g) to providers of CMRS "would be inconsistent with the deregulatory intent" of 47 U.S.C. § 332(c) (authorizing Commission to exempt CMRS from some regulations), the definition of "telephone toll service" in 47 U.S.C. § 153(48), and the proconsumer purpose of the 1996 Telecommunications Act overall. However probative these arguments may be in determining whether the Commission's interpretation of § 254(g) is reasonable, they do not rise to the level of demonstrating that the Congress has spoken directly to this precise issue.
 
 
 28
 In light of the text and legislative history of § 254(g), then, it is unclear whether CMRS is included in the phrase "interexchange telecommunications service": the Congress may have been referring only to wireline interexchange service, or it may also have meant to include "comparable" CMRS. At this juncture we would ordinarily proceed to step two and consider whether the Commission's interpretation of the statute is reasonable. In this case, however, the Commission never exercised its discretionary authority to interpret the statute, as the Second Reconsideration Order makes clear; because it believed that the plain text of § 254(g) subjected providers of CMRS to the requirement of rate integration, the Commission did not go on to show why, even if it is not the only possible interpretation of the statute, it is nonetheless a reasonable interpretation of the statute. 14 F.C.C.R. at 396 p p 10, 11, 18.
 
 
 29
 Thus the Commission "act[ed] pursuant to an erroneous view of law and, as a consequence, fail[ed] to exercise the discretion delegated to it by Congress." Prill v. NLRB, 755 F.2d 941, 942 (D.C. Cir. 1985); see also FCC v. RCA Communications Inc., 346 U.S. 86, 95-96 (1953). Because the Commission might well exclude CMRS from coverage under § 254(g) as an exercise of its discretion, we must remand this matter for the Commission to make that determination in the first instance. See SEC v. Chenery Corp., 318 U.S. 80, 88 (1943); Prill, 755 F.2d at 956-57.**
 
 III. Conclusion
 
 30
 The petition for review is denied insofar as it challenges the Commission's requirement that carriers integrate their interstate long distance rates with those of all commonly owned or controlled affiliates in both contiguous and non-contiguous domestic locations. The petition is granted insofar as it challenges the Commission's requirement that providers of CMRS likewise integrate their rates. The orders under review are vacated in relevant part and this matter is remanded to the Commission for further consideration.
 
 
 31
 So ordered.
 
 
 
 Notes:
 
 
 *
 The Commission, without expressing any doubt that § 254(g) applies to CMRS providers, stayed application of the rule requiring CMRS providers to integrate their rates across affiliates pending further consideration whether such integration would produce anticompetitive effects owing to the prevalence of cross-ownership and joint ventures in the CMRS industry. See Stay Order, 12 F.C.C.R. at 15746 p 14.
 
 
 **
 In view of this disposition, we do not address the petitioners' alternative claim that if § 254(g) applies to providers of CMRS then the Commission is required by 47 U.S.C. § 160 to forbear from enforcement of the requirement.